**FEDERAL DEPOSIT INSURANCE COR-PORATION, as Receiver for Jefferson Bank & Trust, Plaintiff,**

v.

**FIRST INTERSTATE BANK OF DEN-VER, N.A., Refco Group, Ltd., Refco, Inc.; Refco Capital Corporation; Refco Securities, Inc.; Kimberly Goodman; and Security Pacific National Trust Company (NY), Defendants.**

Civil Action No. 93–B–85.

United States District Court, D. Colorado.

July 10, 1996.

A. Johnson, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, for Defendant Security Pacific National Trust Company [NY].

Kimberly Goodman, Grand Island, NY.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Defendants, First Interstate Bank of Denver, N.A. (FIB or First Interstate) and Refco Group, Ltd. (RGL), Refco, Inc. (RI), Refco Capital Corporation (RCC), Refco Securities, Inc. (RSI) (collectively, REFCO) have moved for dismissal of various claims of plaintiff, the Federal Deposit Insurance Corporation (FDIC), as receiver for Jefferson Bank & Trust (JBT or Jefferson Bank). On March 28, 1996, pursuant to a joint motion, I entered an order dismissing with prejudice all of FDIC's claims against First Interstate. Accordingly, all pending motions filed by First Interstate or by another party against First Interstate are moot. Also, FDIC moves to strike designation of non-party liability by REFCO. I will deny REFCO's motion to dismiss in its entirety and grant FDIC's motion to strike.

### I.

JBT filed its original complaint and first amended complaint (complaint) in state court. On January 14, 1993, this case was removed here pursuant to 28 U.S.C.A. § 1441. Removal was based on this court's original jurisdiction over plaintiff's federal racketeering and securities claims, the eighteenth, nineteenth and twenty-fourth claims for relief, pursuant to 28 U.S.C.A. § 1331, and supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C.A. § 1367. On July 2, 1993, the FDIC was appointed receiver for JBT.

The third amended complaint alleges with specificity the existence of a fraudulent scheme among the defendants, their employees, and Steven D. Wymer (Wymer). The alleged object of the scheme was to commit racketeering acts against Wymer's former clients, including Jefferson Bank, principally through actions constituting violations of fed-

Craig B. Shaffer, S. Kirk Ingebretsen, Peggy Anderson, Terry Jo Epstein, Dufford & Brown, Denver, CO, for plaintiff.

Frederick J. Baumann, Samuel Ventola, Rothgerber, Appel, Powers & Johnson, Denver, CO, Joseph K. Brenner, Mark D. Cahn, Thomas Mueller, Richard Sigel, Wilmer, Cutler & Pickering, Washington, DC, for Defendant First Interstate Bank of Denver, N.A.

Edward W. Stern, Parcel, Mauro, Hultin & Spaanstra, P.C., Denver, CO, Jack Weinberg, Scott E. Hershman, Marianne Bretton–Granatoor, Therese M. Doherty, Ronnie L. Silverberg, Graubard Mollen Horowitz Pomeranz & Shapiro, New York City, for Defendants Refco Group, Ltd.; Refco, Inc.; Refco Capital Corporation and Refco Securities, Inc.

Robert T. McAllister, Kathryn Meyer, McAllister & Murphy, P.C., Denver, CO, Paul M. Reitler, James L. Sanders, Beverly

eral mail fraud, wire fraud, and bank fraud statutes. The third amended complaint sets forth seventeen claims for relief arising from defendants' part in an alleged fraudulent scheme that resulted in the diversion of more than $40 million of Jefferson Bank's funds. These circumstances have been a prolific source of litigation here and in the Tenth Circuit. *See Lyons v. Jefferson Bank & Trust,* 994 F.2d 716 (10th Cir.1993); *Lyons v. Jefferson Bank & Trust,* 793 F.Supp. 989 (D.Colo.1992); *Lyons v. Jefferson Bank & Trust,* 793 F.Supp. 981 (D.Colo.1992); *Lyons v. Jefferson Bank & Trust,* 781 F.Supp. 1525 (D.Colo.1992). Wymer is now, and will be for some time, in the custody of the United States Government.

## II.

### Choice of law

REFCO moves to dismiss claims one, two and four based on the Colorado Organized Crime Control Act, section 18–17–101 *et seq.,* C.R.S. (COCCA) and the Colorado Securities Act, sections 11–51–125(3) and 11–51–604(4), C.R.S. (CSA). Defendants cite a New York choice of law provision in a RSI customer agreement signed by JBT. (3d Amended Complaint ¶ 11; Weinberg declaration, Exh. A). It is undisputed that RSI never signed the agreement. Thus, FDIC contends there is no choice of law agreement. REFCO asserts that because in the past the FDIC has relied on various provisions of the agreement, it is now estopped from asserting there was no contract.

■ Interpretation of a written contract is generally a question of law for the court. *Luna v. City and County of Denver,* 718 F.Supp. 854, 857 (D.Colo.1989); *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984). Where, as here, the existence of a contract is disputed and there is conflicting evidence, it is for the jury to decide whether a contract, in fact, exists. *Luna,* 718 F.Supp. at 857 *citing I.M.A., Inc. v. Rocky Mountain Airways, Inc.,* 713 P.2d 882 (Colo.1986). *See also Bowne of New York, Inc. v. International 800 Telecom Corp.,* 178 A.D.2d 138, 576 N.Y.S.2d 573 (1991). A definitive choice of law determination is inappropriate and premature at this Rule 12 phase of the case.

## III.

### REFCO's motion to dismiss

A. *Motion to dismiss for lack of personal jurisdiction*

Refco Capital Corporation (RCC), Refco Group, Ltd. (RGL), and Refco, Inc. (RI) move to dismiss this action against them for lack of personal jurisdiction pursuant to Fed. R.Civ.P. 12(b)(2).

■ A plaintiff bears the burden of establishing personal jurisdiction over a defendant. *Behagen v. Amateur Basketball Ass'n of the U.S.A.,* 744 F.2d 731, 733 (10th Cir. 1984), *cert. denied,* 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985). Prior to trial, a plaintiff need only make a *prima facie* showing of jurisdiction based on affidavits and other written materials. The allegations of the complaint must be taken as true if they are uncontroverted by the defendant's affidavits. If there are conflicting affidavits, all factual disputes are resolved in plaintiff's favor. *Id.; GCI 1985–1 LTD. v. Murray Properties Partnership of Dallas,* 770 F.Supp. 585, 587 (D.Colo.1991).

1. *Alter-ego/piercing corporate veil*

FDIC seeks to hold RGL, RI, RSI, and RCC liable for each other's acts alleging that these entities are instrumentalities and alteregos of each other. FDIC has met its requisite jurisdictional burden under the alter-ego doctrine.

■ The acts of a subsidiary corporation are not automatically attributable to the parent without the requisite showing of corporate control, even if the parent is the sole owner of the subsidiary. *United Elec. Radio and Mach. Workers of America v. 163 Pleasant Street, Corp.,* 960 F.2d 1080, 1084 (1st Cir.1992); *see also Sears, Roebuck and Co. v. Sears plc,* 752 F.Supp. 1223, 1225 (D.Del. 1990). A presumption of corporate separateness exists that is overcome only by clear evidence that the parent in fact controls the subsidiary. *United Elec. Workers,* 960 F.2d at 1091. However, "if it is shown that the

parent corporation used the corporate entity to perpetuate a fraud or wrong on another, equity will permit plaintiff to pierce the corporate veil." *Skidmore, Owings & Merrill v. Canada Life Assur. Co.*, 706 F.Supp. 758 (D.Colo.1989) citing *Micciche v. Billings*, 727 P.2d 367 (Colo.1986). To pierce the corporate veil, evidence must show that the corporate entity "was used to defeat public convenience, or to justify or protect wrong, fraud or crime." *Boughton v. Cotter Corp.*, 65 F.3d 823, 836 (10th Cir.1995).

▮ FDIC alleges the following. RGL, a Delaware corporation with its principal place of business in Illinois, owns and/or controls the activities of RI, RCC, and RSI. C/O ¶ 2(g). Also, the REFCO defendants share many of the same officers and directors. C/O ¶ 4a; Exh. F, G, and H. REFCO entities do not observe corporate formalities of shareholder or board meetings. Exh. K pp. 232–34, 301–04. The REFCO entities transfer at their discretion and without notice, between accounts maintained at those affiliates, money, securities, commodities, and other property belonging to other REFCO entities. C/O ¶ 4a; Exh. I. Phillip Bennett, as CFO of RGL and president of RCC sets the compensation for senior management at RSI. Exh. J. pp. 309–10. Bennett, who does not hold any management position with RSI, has the authority to suspend trading in any client account at RSI. C/O ¶ 4d. He also approved Wymer's request that defendant Kimberly Goodman, alleged to be a central participant in the scheme and beneficiary of Wymer's largesse, be RSI's account executive on Wymer's Denman/ITM accounts and regularly reviewed and approved line of credit requests of RSI customers. *Id.*

RCC had a policy of not releasing or transferring funds from customer accounts without first confirming that RSI had neither need for nor claim upon the funds. RCC also regularly provided to RSI employees monthly account statements for Wymer's firms, Denman/ITM, and RCC, without customer knowledge or approval. *Id.* On February 9, 1990, Bennett, president of RCC and CFO of RGL, approved a credit line request of JBT submitted to RSI on the express condition that "money is always in the [Refco Capital] account when positions are on." *Id.* Also, FDIC alleges that JBT's account at RCC played a pivotal role in the scheme and was a primary vehicle for Wymer's and REFCO's diversion of JBT's funds.

Under these well pleaded and supported allegations, plaintiff may seek to pierce the corporate veil and hold RGL, RI, RSI, and RCC liable for each other's debts and obligations. Importantly, FDIC's alter-ego doctrine bears upon the following jurisdictional and substantive motion analysis because the actions of every REFCO entity may be considered the acts of all REFCO entities.

### 2. *Long-arm Jurisdiction*

▮ Jurisdiction in this court over a nonresident defendant in a diversity action is determined by the law of the forum state. *See* Fed.R.Civ.P. 4(e); *see also Omni Capital Intern. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987); *Wenz v. Memery Crystal*, 55 F.3d 1503, 1506 (10th Cir.1995); *Rambo v. American Southern Ins. Co.*, 839 F.2d 1415, 1416 (10th Cir.1988). Thus, I must first determine whether the exercise of jurisdiction is authorized by the Colorado long-arm statute, § 13–1–124, C.R.S. If jurisdiction is authorized by the long-arm statute, I then determine whether the exercise of jurisdiction comports with constitutional due process. *Wenz*, 55 F.3d at 1507; *Far West Capital Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995). This two-step analysis is consistent with the analytical approach Colorado courts use to determine personal jurisdiction. *Classic Auto Sales, Inc. v. Schocket*, 832 P.2d 233, 235 (Colo.1992). In Colorado, assertion of personal jurisdiction over defendants must satisfy both the requirements of the long-arm statute and the due process clause of the Fourteenth Amendment. *See Custom Vinyl Compounding, Inc. v. Bushart & Associates, Inc.*, 810 F.Supp. 285, 287 (D.Colo.1992). Also, if one corporation is the alter ego of another, a court may pierce the corporate veil and base its jurisdiction on one corporation's contacts with the forum state.

The Colorado long-arm statute provides two grounds for the exercise of personal jurisdiction—the commission of a tortious act

in Colorado or the transaction of business in Colorado. § 13–1–124(1)(a and b).

### a. § 13–1–124(1)(a)—Transaction of Business

 "Transaction of business" in a forum state may result in personal jurisdiction under two separate analyses—"specific personal jurisdiction" and "general personal jurisdiction." "Specific personal jurisdiction" may· arise if a defendant has "purposefully directed" its activities toward the forum state, and if the lawsuit is based upon injuries that "arise out of" or "relate to" the defendant's contact with the state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2181–82, 85 L.Ed.2d 528 (1985). The rationale is to give "fair warning [to a defendant] that a particular activity may subject [it] to the jurisdiction of a foreign sovereign." *Id. quoting Shaffer v. Heitner,* 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683 (1977).

 Colorado has adopted a three prong test for specific personal jurisdiction. *Van Schaack & Co. v. District Court,* 538 P.2d 425, 426 (Colo.1975). First, the defendant must purposefully avail itself of the privilege of acting in Colorado or of causing important consequences in the state. Second, the cause of action must arise in the forum state from the consequences of defendant's activities. Third, the activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Id. See also Waterval v. District Court,* 620 P.2d 5, 9 (Colo. 1980).

 In contrast, general personal jurisdiction is premised on a defendant's conduct and connection with the forum state such that it should "reasonably anticipate being haled into court there." *Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183. It is essential that there be some act by which the defendant "purposefully avails" itself of the privilege of conducting activities within the forum state. *Id.* Contacts between the defendant and the forum state cannot be "random," "fortuitous," or "attenuated." *Id. citing Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984). For general jurisdiction to exist, a defendant's contacts with a state must be greater than those required for specific jurisdiction. *Doe v. National Medical Services,* 974 F.2d 143, 146 (10th Cir.1992).

 Due process principles require a defendant to have sufficient minimum contacts with the forum state so that maintenance of the suit will not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A plaintiff must show: 1) the defendant purposefully availed itself of the privilege of acting in the forum state or of causing consequences in that state; 2) the cause of action arises from the consequences in the forum state of the defendant's activities; and 3) a substantial connection exists between the defendant's activities and the forum state to make the exercise of jurisdiction reasonable. *Mr. Steak, Inc. v. District Court,* 194 Colo. 519, 574 P.2d 95 (1978).

 Here, RSI had recurring communications in Colorado with various Denman/ITM clients, including JBT. These communications included receiving monthly account statements and other correspondence about their REFCO accounts. *See e.g.* Exh. A and C. Also, RSI employees, including Goodman, were licensed to sell and did sell securities in Colorado. Exh. B.

Isolated correspondence is generally insufficient to form the basis for jurisdiction. *See Gehling v. St. George's School of Medicine, Ltd.,* 773 F.2d 539 (3d Cir.1985). However, the regularity of the correspondence between RSI and Colorado clients is sufficient to determine that RSI did business within the state sufficient to exercise both specific and general personal jurisdiction over RSI. Application of the alter-ego doctrine, then, extends this jurisdiction to all REFCO defendants.

### b. § 13–1–124(a)(a)—Commission of a Tortious Act

 Colorado's long-arm statute also provides that, by the commission of a tortious act within Colorado, a person submits to the

jurisdiction of Colorado courts in any cause of action arising from that act. C.R.S. § 13–1–124(1)(b). "In order to satisfy the statutory standard for assertion of long arm jurisdiction ... it is not necessary that both the tortious conduct constituting the cause and the injury constituting the effect take place in Colorado." *Classic Auto Sales v. Schocket*, 832 P.2d 233, 235 (Colo.1992). However, the injury in the forum state must be direct, not consequential or remote. *GCI 1985–1 Ltd., v. Murray Properties Partnership of Dallas*, 770 F.Supp. 585, 590 (D.Colo.1991).

▮▮ FDIC alleges RSI and RCC committed numerous tortious acts including racketeering, civil conspiracy, fraud, conversion, and negligence. Also, it is alleged that JBT, a Colorado resident, sustained injuries in Colorado. For example, FDIC alleges that RSI sent false audit confirmations to JBT, C/O ¶ 24, and that Goodman, an employee of RSI, provided Wymer with REFCO stationery which enabled him to make false representations to JBT. *Id.* at ¶ 18, 25, 26. These allegations are sufficient so that RSI, and under the alter-ego doctrine all REFCO defendants, should submit to the jurisdiction of Colorado courts. C/O ¶ 55, 56, 67.

## IV.

### Motion to dismiss substantive claims

Under Rule 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). If the plaintiff has pled facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id.* In reviewing the sufficiency of the complaint, all well-pled facts, as opposed to conclusory allegations, must be taken as true. *Weiszmann v. Kirkland and Ellis*, 732 F.Supp. 1540, 1543 (D.Colo.1990). All reasonable inferences must be liberally construed in the plaintiff's favor. *Id.*

### A. Claims one and two—COCCA

Assuming Colorado law applies, REFCO also moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss claims one and two based on COCCA section 18–17–104(3), C.R.S. for failure to state a claim upon which relief can be granted. During oral argument, plaintiff's counsel reiterated FDIC's allegation that the REFCO defendants are primary violators of the COCCA. In the alternative, FDIC alleges that the REFCO defendants are liable secondarily under COCCA as aiders and abettors and under the doctrine of respondent superior.

### 1. Primary liability

Section 18–17–104(3), C.R.S. imposes liability on "persons[s] employed by, or associated with [the enterprise], [who] knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity...." REFCO moves to dismiss FDIC's claims for relief under COCCA based upon primary liability for failure to plead facts showing that REFCO directed the affairs of the alleged racketeering enterprise.

▮▮ Here, FDIC alleges, *inter alia*, RSI was aware of "unusual activity" and "non-standard practices" in Wymer's Denman/ITM accounts and omitted to disclose that information to JBT. C/O ¶ 11. For example, RSI employee Goodman, failed to tell JBT that Wymer told her he was not reporting all trading activity to Denman/ITM clients, C/O ¶ 14 and he was incurring losses in client accounts that he was not reporting. C/O ¶ 15. Also, FDIC alleges that RCC permitted Wymer to open an account in the name of JBT and divert funds from JBT's account to unauthorized uses while failing to verify Wymer's authority over the account or to act on JBT's behalf. C/O ¶ 13. These allegations are sufficient to withstand the motion to dismiss claims one and two based upon a primary violation of COCCA.

### 2. Secondary liability

In the alternative, REFCO moves to dismiss FDIC's first and second claims in their entirety "to the extent they are premised

entirely upon theories of secondary liability—aiding and abetting and respondeat superior liability." REFCO Brf. p. 10. I am unpersuaded.

### a. *aiding and abetting liability*

Defendants argue that the failure of COCCA to expressly provide for "aiding and abetting" liability is fatal to FDIC's claims based on secondary liability. Neither the Colorado Supreme Court nor the Colorado Court of Appeals has addressed secondary liability under COCCA.

COCCA provides:

> [i]t is unlawful for any person employed by, or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity....

§ 18–17–104(3), C.R.S.

Under COCCA, "racketeering activity" means "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit [a]ny conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)(A), (1)(B), (1)(C), and (1)(D)" or any violation of the enumerated criminal acts. § 18–17–103(5)(a and b), C.R.S.

 Colorado law also provides that:

> [a] person is legally accountable as principal for the behavior of an another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he aids, abets, or advises the other person in planning or committing the offense.

§ 18–1–603, C.R.S.

It may be reasoned that "aiding and abetting" liability is encompassed within "committing" wrongful conduct as defined by Colorado statute. Also, a legislature is presumed to know existing law and judicial precedent when it enacts legislation. *Rauschenberger v. Radetsky,* 745 P.2d 640 (Colo. 1987). Thus, it would be redundant for the Colorado General Assembly to add "aiding and abetting" to the prohibited list of racketeering activity under COCCA.

I am mindful that concepts of criminal, rather than civil, law define liability as a principal for "aiding and abetting." However, COCCA is found in the Colorado Criminal Code. Moreover, the Colorado General Assembly distinguished carefully between criminal penalties, § 18–17–105, C.R.S., and civil remedies, § 18–17–106, C.R.S., for COCCA violations. If the definition of "racketeering activity" for purposes of civil remedies were different than the definition for purposes of imposition of criminal penalties, the Colorado General Assembly knew how to make that distinction.

 My conclusion that "aiding and abetting" liability is a viable claim under COCCA is strengthened by my application of familiar principles of statutory construction. A court's first goal is to determine and give effect to the legislative intent expressed in a statute. *People v. Chaussee,* 880 P.2d 749, 757 (Colo.1994); *State Engineer v. Castle Meadows, Inc.,* 856 P.2d 496, 504 (Colo.1993). This result is also consistent with the "liberal construction adopted to effectuate the intent and purpose of COCCA." *Chaussee,* 880 P.2d. at 758; *see* § 18–17–108, C.R.S.

COCCA's legislative declaration emphasizes its clear purpose in addressing the grave problem posed by organized crime in Colorado and the nation:

> [O]rganized crime in the state of Colorado ... is a highly sophisticated, diversified, and widespread activity that annually consumes millions of dollars locally and billions of dollars nationally from this state's and the nation's economy through unlawful conduct and the illegal use of force, fraud, and corruption.... Organized crime activities within this state weaken the stability of this state's and the nation's economy, harm innocent investors and competing organizations, impede free competition, threaten the peace and health of the public, endanger the domestic security, and undermine the general welfare of the state and its citizens....
>
> [T]he general assembly declares that it is the purpose of this article to seek the eradication of organized crime in this state by strengthening the legal tools in the evidence-gathering process, by establish-

ing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

§ 18–17–102, C.R.S.

Although COCCA makes no express reference to "aiding and abetting" liability, it provides that it is unlawful for a person to "knowingly conduct or participate, directly *or indirectly,* in [an] enterprise through a pattern of racketeering activity." The phrase "directly or indirectly," reflects the Colorado General Assembly's intent to provide for secondary liability.

REFCO's reliance upon recent United States Supreme Court authority precluding secondary liability based on aiding and abetting and respondeat superior, *see Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994); *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), is tenuous at best.

The Colorado Supreme Court recently indicated that in interpreting Colorado statutes modeled after parallel federal statutes it would not necessarily follow federal precedent. *See Chaussee,* 880 P.2d at 758 (for purposes of COCCA, construction of "continuity" requirement adopted by federal cases is not correct).

Defendants rely heavily on the United States Supreme Court's ruling in *Central Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (no secondary liability for aiding and abetting conduct under the Securities Exchange Act of 1934, § 10(b); 15 U.S.C. § 78j(b)) for their position that there is no aiding and abetting liability under COCCA. However, *Central Bank* addresses private rights of action under the federal securities acts rather than under the RICO statute. Moreover, in view of COCCA's clearly stated purpose and the suspect reach of RICO over aiding and abetting liability, it is reasonable to anticipate that the Colorado Supreme Court would construe COCCA to cover such secondary liability. I hold that allegations of secondary liability through aiding and abetting state a

claim for which relief may be granted under COCCA.

b. *Respondeat superior*

Defendants also move to dismiss secondary liability claims which are based on respondeat superior. Again, I am not persuaded.

 Principles of respondeat superior impose liability on a corporation as employer for the acts of an employee which have been assigned to her by the employer or if she is doing what is necessarily incidental to her assigned work. *Destefano v. Grabrian,* 763 P.2d 275, 278 (Colo.1988). Under respondeat superior, an employee's actions are imputed to the employer. Thus, if those actions constitute participation in the operation or management of the COCCA enterprise, then the employer has also participated.

 FDIC has alleged that REFCO violated COCCA on the alternative basis of respondeat superior. C/O ¶ 67. Respondeat superior is a proper basis for a claim under the COCCA. *See Central Bank and Reves.*

c. *Sufficiency of pleading*

COCCA forbids "any person employed by, or associated with, any enterprise to knowingly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity...." The terms "conduct" or "participation" are not defined in COCCA. REFCO also moves to dismiss plaintiff's COCCA claim under § 18–17–104(3), C.R.S. based on both primary and secondary liability for failure to plead facts to show REFCO " 'directed' the affairs of the alleged racketeering enterprise." REFCO Br. p. 15. In contrast with the issue of secondary liability, at this juncture I believe the Colorado Supreme Court would find federal authority instructive.

The parallel federal provision, 18 U.S.C. § 1962(c), provides that "it shall be unlawful for any person ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." COCCA and RICO differ only in the last clause of the provision. However, the difference is insig-

nificant in light of the Supreme Court's similar construction of each use of the word "conduct" in RICO. *Reves v. Ernst & Young,* 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993). "Conduct" means to lead, run, manage, or direct. *Id.;* Webster's Third New International Dictionary 474 (1976). In context, the word indicates "some degree of direction." *See Reves,* 507 U.S. 170, 178, 113 S.Ct. at 1169. "Participate" means "to take part in." Webster's Third New International Dictionary 1646 (1976). "Liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Id.* at 185, 113 S.Ct. at 1173. Thus, liability attaches if one participates in the operation or management of the enterprise itself. *Reves,* 507 U.S. 170, 182, 113 S.Ct. at 1172. "Enterprise" is properly viewed as the "vehicle through which the unlawful pattern of racketeering activity is committed, rather than the victim of that activity." *National Organization for Women v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 804, 127 L.Ed.2d 99 *Reves v. Ernst & Young,* 507 U.S. 170, 182, 113 S.Ct. at 1171.

▪ FDIC alleges that JBT executed a Customer Agreement whereby REFCO agreed to act as JBT's securities broker. C/O ¶ 11. The Customer Agreement provided that all transactions in JBT's account were subject to all applicable law and rules and regulations of all federal, state, and self-regulatory agencies. FDIC also alleges that REFCO had a memo in its files dated May 18, 1988 which noted "unusual activity" and "non-standard practices" in the accounts managed by Denman. Also the memo stated that REFCO had temporarily suspended trading with Denman in 1988. *Id.*

On January 17, 1990, REFCO permitted Wymer to open an account in the name of JBT. At that time, Wymer instructed REFCO to send all monthly statements and confirmations for the JBT account to Denman's address at Irvine, California. C/O ¶ 12. REFCO never verified Wymer's authority to act on behalf of JBT. *Id.* In February, 1990, JBT sent REFCO a signed customer account application which designated Mo Grotjohn and Kristen Caldeira as the only individuals "authorized to make investments in and withdrawals from" JBT's REFCO account. Despite this notice, REFCO continued to act on instructions from Wymer and gave Wymer unlimited authority to divert funds from JBT's account to unauthorized uses including commingling client funds, using commingled funds to purchase securities, engaging in speculative trading through Denman/ITM and nominee accounts, and diverting securities and funds for Wymer's personal benefit. C/O ¶ 13, 17.

On April 4, 1990, Goodman met with JBT's Grotjohn and falsely confirmed that JBT's balance in its REFCO account was approximately $17 million. She also confirmed Wymer's misrepresentations regarding performance of the account to date. C/O ¶ 15. Goodman omitted telling Grotjohn that Wymer had told her he was not reporting all trading activity to his clients and was incurring losses for clients that he failed to report. *Id.* FDIC also alleges that Goodman gave Wymer REFCO stationary to assist him in creating false documentation. *Id.* at 18. FDIC's complaint also details over 40 unauthorized withdrawals from JBT's REFCO account totalling in excess of $30 million that REFCO permitted Wymer to make without JBT's knowledge or consent. FDIC also alleges REFCO concealed these transactions by not providing statements and confirmations to JBT. C/O ¶ 19.

Based on the foregoing, the FDIC has alleged sufficient participation by REFCO in the conduct of the enterprise's affairs to withstand REFCO's motion to dismiss. *Reves,* 507 U.S. 170, 182, 113 S.Ct. at 1172. Accordingly, I will deny REFCO's motion to dismiss claim one.

### d. *Claim two—COCCA Conspiracy, § 18–17–104(4), C.R.S.*

REFCO moves to dismiss claim two, a COCCA conspiracy claim pursuant to § 18–17–104(4), C.R.S., asserting there is no conspiracy liability under theories of aiding and abetting or respondeat superior.

Section 18–17–104(4) provides:

It is unlawful for any person to conspire or endeavor to violate any of the provisions of subsection (1), (2), or (3) of this section.

Based on my preceding analysis of these secondary liability theories, REFCO's motion to dismiss claim two is without merit.

■ REFCO also seeks dismissal of claim two because "plaintiff fails to plead a violation of § 18–17–104(3)." However, the third amended complaint states that "Refco, individually and by and through their employees ... consciously and knowingly conspired ... to violate C.R.S. § 18–17–104(3) by agreeing, formally or tacitly, or by attempting to participate, directly or indirectly, in the enterprise referred to above through a pattern of racketeering activity." C/O ¶ 69. These allegations are adequate.

### B. REFCO's motion to dismiss Colorado common law claims

#### 1. Claim three—civil conspiracy

Defendants move to dismiss plaintiff's third claim for civil conspiracy on the sole basis that New York law applies to plaintiff's claims and under New York law there exists no tort of civil conspiracy. Having found that New York law may not apply in this case, I will deny the motion to dismiss claim three on this basis.

REFCO also moves to dismiss claim three for failure to allege facts demonstrating that Wymer and REFCO had a "meeting of the minds on the object and course of action." REFCO Reply Brief p. 39. I disagree.

■ To establish a civil conspiracy in Colorado, a plaintiff must show: 1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) an unlawful overt act; and 5) damages as the proximate result. *Jet Courier Service, Inc. v. Mulei*, 771 P.2d 486, 502 (Colo.1989). A court will not infer the necessary agreement. Facts showing such an agreement must be alleged by the plaintiff. *See Nelson v. Elway*, 908 P.2d 102, 106 (Colo.1995). However, an express agreement is not necessary. A tacit agreement may suffice. *Resolution Trust Corp. v. Heiserman*, 898 P.2d 1049, 1056–57 (Colo.1995). By its very nature a conspiracy is seldom provable by direct evidence. Thus, the requisite agreement may be found by viewing the circumstances. *Id.*

■ Here, FDIC's allegations concerning REFCO employee Goodman's meeting with JBT representative Grotjohn, C/O ¶ 15, and the allegations contained in ¶¶ 18 and 19a can be viewed fairly as indicia of an agreement sufficient to prove that REFCO consciously conspired with Wymer.

#### 2. Claim four—Colorado Securities Act (CSA)

REFCO moves to dismiss claim four, violation of the Colorado Securities Act (CSA), §§ 11–51–125(3) and 11–51–604(4), C.R.S. for failure to state a claim upon which relief can be granted.

■ First, REFCO seeks dismissal of claim four based on application of the holding of *Central Bank* that there is no aiding and abetting liability. However, FDIC has not based claim four on aiding and abetting liability. Rather, FDIC relies on respondeat superior liability. C/O ¶ 83. Having held that respondeat superior liability is a viable theory in this action, I will deny the motion to dismiss claim four on that basis.

REFCO also seeks dismissal of claim four asserting that §§ 11–51–125(3) and 604(4), C.R.S. apply only to initial offerings of securities rather than the sale of U.S. Treasury Notes in the secondary market. I disagree.

■ The Colorado Supreme Court once held that federal precedent is persuasive in construing similar language in Colorado securities law. *People v. Riley*, 708 P.2d 1359, 1363 (Colo.1985). This is no longer the case. Rather, when construing a Colorado securities statute, fundamental principles of statutory construction are employed before resorting to case law regarding similar federal law. *Rosenthal v. Dean Witter Reynolds, Inc.*, 908 P.2d 1095 (Colo.1995). The first inquiry is to look to the plain language of the statute. *People v. Warner*, 801 P.2d 1187, 1190 (Colo.1990).

■ Section 11–51–125(3), C.R.S., provides, in pertinent part:

Any person who offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statement . . . is liable to the person buying the security from him . . . .

Section 11–51–604(4), C.R.S., provides:

Any person who sells a security in violation of section 11–51–501(1)(b) . . . is liable to the person buying the security from such person . . . .

Neither provision contains language limiting its applicability to initial offerings. Without such express language, I will not read this limitation into the statute. *Rosenthal,* 908 P.2d at 1096.

■ REFCO also contends the CSA does not apply to the sale of securities issued or guaranteed by the United States. Again, I disagree.

Sections 11–51–125(3) and 604(4) contain no language exempting government securities. Rather, § 11–51–125(4) provides that "exemptions provided elsewhere in this article shall not apply to the provisions of this section." Moreover, the Colorado Supreme Court has stated that "[t]he claim of misrepresentation under the Colorado Securities Act does not depend upon the exempt or non-exempt status of the security." *Lowery v. Ford Hill Inv. Co.,* 192 Colo. 125, 132, 556 P.2d 1201, 1209 (1976).

Next, REFCO moves to dismiss claim four asserting (1) the complaint fails to allege facts evidencing an actionable misleading statement made in connection with the offer or sale of securities and (2) that the offer or sale did not occur in Colorado.

a. *Inadequate allegations*

■ A plaintiff is entitled to relief "[w]henever the elements of misrepresentation . . . are proved, and the defendant fails to establish the affirmative defense of lack of knowledge . . . ." *Id.* In its fourth claim for relief, FDIC lists thirty instances of security sales from REFCO to to JBT occurring from February, 1990 to February, 1991. C/O ¶ 80a–v. FDIC also incorporates by reference the allegations in ¶¶ 1–51 of the complaint which state that on December 11, 1989,

REFCO tendered a Customer Agreement, C/O ¶ 11, which failed to disclose that REFCO was conspiring with Wymer and assisting him in violating securities laws.

Specific examples include: 1) allegations that REFCO had a memo in its files dated May 18, 1988 which noted "unusual activity" and "non-standard practices" in the accounts managed by Denman; 2) REFCO's failure to disclose that it had temporarily suspended trading with Denman in 1988; and 3) REFCO's failure to verify Wymer's authority to act on behalf of JBT in light of the signed customer account application JBT sent to REFCO in February, 1990 designating Mo Grotjohn and Kristen Caldeira as the only individuals "authorized to make investments in and withdrawals from" JBT's REFCO account. Further, FDIC alleges that during an April 4, 1990 meeting between Goodman and JBT representative Grotjohn, Goodman falsely confirmed that JBT's balance in its REFCO account was approximately $17 million. She also confirmed Wymer's misrepresentations regarding performance of the account to date. C/O ¶ 15. Goodman omitted telling Grotjohn that Wymer had told her he was not reporting all trading activity to his clients and he had failed to tell clients he was incurring losses. *Id.* Also, all of the securities sales in question occurred after these events. Thus, the allegations are sufficient to satisfy the requirement that actionable misleading statements occurred "in connection with the offer, sale or purchase of any security . . . ." § 11–51–501(1), C.R.S.

b. *Transactions occurring in Colorado*

■ REFCO also seeks dismissal arguing that the transactions did not occur in Colorado as required by § 11–51–127(1), C.R.S. Initially, I note that § 11–51–127 was repealed in 1990 and reenacted as § 11–51–102, C.R.S. upon which I rely to determine this issue.

§ 11–51–102 provides, in pertinent part:

(3) . . . an offer to sell or to purchase is made in this state, whether or not either party is then present in this state, when the offer . . . is directed by the offeror to

this state and is received at the place to which it is directed ...

FDIC alleges that JBT's principal place of business was in Colorado, C/O ¶ 2, and that JBT wired funds to REFCO to pay for securities. C/O ¶ 16. These allegations are sufficient to meet the requirements of § 11–51–102 and to withstand a motion to dismiss.

3. *Claims five and six*

Claims five and six, were brought solely against former defendant First Interstate. Having dismissed this action as to First Interstate, claims five and six are no longer pending.

4. *Claims seven and eight for negligence*

 The elements of negligence are: 1) the existence of a legal duty owed to the plaintiff by the defendant; 2) breach of that duty; 3) injury to the plaintiff, and 4) causation. *Observatory Corp. v. Daly,* 780 P.2d 462, 465 (Colo.1989).

 REFCO argues that plaintiff has failed to plead facts which show a causal connection between REFCO's alleged negligence and JBT's claimed damages. The issue of causation is a recurring theme in REFCO's motion to dismiss. REFCO contends that Wymer alone caused JBT's losses. However, this argument ignores exhaustive allegations which depict REFCO in a pivotal role in the scheme. The factual allegations outlined above, including REFCO's knowledge about Wymer's questionable conduct predating JBT's relationship with REFCO, coupled with the numerous and detailed allegations of Goodman's actions, are sufficient to support the causation element of the negligence claims.

5. *Claim nine—conspiring to commit or aiding and abetting false representations*

REFCO did not file a motion to dismiss claim nine.

6. *Claim ten—false representation*

 The elements of the tort of false representation are: 1) a representation (or omission) of a material fact; 2) which was untrue and known to be untrue; 3) offered to induce plaintiff to act; and 4) upon which plaintiff relied to its injury.

REFCO seeks dismissal for failure to allege a causal connection between REFCO's conduct and JBT's losses. However, for the reasons stated in the discussion of claim eight, the pleadings are adequate to withstand a motion to dismiss on this basis.

REFCO also argues that the false audit confirmations sent to JBT by Goodman on January 18, 1991 and November 7, 1991 are insufficient because there is no allegation that JBT invested new monies after receiving the confirmations. (REFCO Br. p. 37–38). However, this narrow view of the compliant ignores other alleged conduct by Goodman and the allegations that JBT maintained its account with REFCO, continued to trade securities through REFCO, and continued to pay REFCO's fees. The complaint adequately states a claim for false representation.

7. *Claim eleven—conspiring to commit or aiding and abetting fraudulent concealment*

Claim eleven is not addressed specifically in REFCO's motion to dismiss. *See* REFCO brief p. 2. However, in footnote 18 p. 33 of the REFCO brief, REFCO moves to dismiss claim eleven because it "purport[s] to rest, in part, on the existence of an alleged fiduciary duty owed by REFCO to JBT." C/O ¶ 127. FDIC has sufficiently pleaded that a fiduciary duty was owed to JBT by REFCO. C/O ¶ 121, 127, 134. Consequently, I will deny any motion to dismiss claim eleven on this ground.

8. *Claim twelve—fraudulent concealment*

 The elements of the tort of fraudulent concealment are: 1) a relationship between the parties that creates a duty to disclose; 2) knowledge of material facts by a party bound to make disclosures; 3) nondisclosure; 4) scienter; 5) reliance; and 6) damages. *H & H Distributors, Inc. v. BBC Intern. Inc.* 812 P.2d 659, 662 (Colo.App. 1990).

REFCO's argument that FDIC fails to plead causation between REFCO's conduct and JBT's losses is without merit.

### 9. Claim thirteen—conspiring to commit or aiding and abetting breach of fiduciary duty

Claim thirteen is not addressed in REFCO's motion to dismiss. *See* REFCO Brief p. 2, 10.

### 10. Claim fourteen—breach of fiduciary duty

■ The elements of breach of fiduciary duty are: 1) the existence of a fiduciary relationship between plaintiff and defendant; 2) defendant's breach of the fiduciary duty; and 3) damages as a result of the breach.

REFCO again argues that FDIC fails to plead the requisite causation. Again, I find no merit to the argument.

### 11. Claim fifteen—conspiracy to commit or aid and abet conversion

Claim fifteen is not addressed in REFCO's motion to dismiss. *See* REFCO Brief p. 2.

### 12. Claim sixteen—conversion

■ REFCO seeks dismissal of FDIC's conversion claim against it based on "conclusory" pleadings. Conversion is defined as any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another. *Byron v. York Inv. Co.*, 133 Colo. 418, 296 P.2d 742 (1956).

■ FDIC pleads that REFCO intentionally, wrongfully, and without authorization exercised dominion or control over investment funds and securities belonging to JBT by commingling that property with funds and securities belonging to Wymer, Denman/ITM, by failing to deposit wire transfers of funds into JBT's investment account at REFCO Capital, or allowing investment in and withdrawals from JBT's account at Refco Capital without proper authorization. C/O ¶ 19 and 155. Under the notice pleading requirements of Rule 8, FDIC's allegations are sufficient to withstand a motion to dismiss.

### 13. Claim seventeen—breach of contract

REFCO moves to dismiss FDIC's claim seventeen for breach of contract for failing to satisfy the pleading requirements of Fed. R.Civ.P. 8. Claim 17 is pleaded adequately.

■ Fed.R.Civ.P. 8(a)(2) requires a "short and plain statement of claim showing that the pleader is entitled to relief." The elements of a breach of contract claim are: 1) the existence of a contract; 2) the failure of performance; and 3) damages. *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo.1992).

■ FDIC alleges the existence of a contract between JBT and Refco Capital, C/O ¶ 13,159), that REFCO breached its contract with JBT by failing to deposit wire transfers from JBT into its REFCO investment account and/or by allowing investments into and withdrawals from JBT's REFCO investment account without proper authorization, C/O ¶ 160, and that JBT was damaged by these alleged breaches. C/O ¶ 161. No more is required. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 167–68, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) (no heightened pleading standard under Rule 8).

## V.

### Motion to strike designation of non-liability

■ Also before me is FDIC's motion to strike REFCO's designations of non-party liability. FDIC argues that these designations should be stricken because they are untimely, they fail to comply with the notice requirements, and the designations are only valid for negligence claims. C.R.S. § 13–21–111.5. I will grant the motion.

This action was filed by Jefferson Bank on December 22, 1992. On July 2, 1993, FDIC was appointed receiver for JBT. FDIC moved for a ninety day stay of proceedings which was granted along with two additional requests for stay. On July 1, 1994, the stay was lifted. FDIC filed a second amended complaint on July 5, 1994. On August 18, 1994, a scheduling conference was held by

the magistrate judge at which counsel for REFCO raised the issue of designation of non-parties. REFCO indicated that the parties had discussed the matter but had not reached an agreement on a date when the designations would be due.

On August 29, 1994, counsel for REFCO sent a letter to FDIC's counsel requesting FDIC's position on an appropriate designation date to be included in the scheduling order. There was no follow-up by either side. On December 21, 1994, REFCO filed their non-party designations.

Section 13–21–111.5 states: "[n]egligence or fault of a nonparty may be considered if the claimant entered into a settlement agreement with the nonparty or if the defending party gives notice that a nonparty was wholly or partially at fault within ninety days following commencement of the action unless the court determines that a longer period is necessary." "The primary purpose of the statute was to abolish the harsh effects of joint and several liability." *Watters v. Pelican Inter., Inc.*, 706 F.Supp. 1452, 1457 (D.Colo. 1989). "The natural course of litigation may prevent a defendant from developing a well-founded designation until after the 90–day designation period has run. A court may find, however, that the burden an untimely designation imposes on the efficient progress of litigation outweighs the need for designation demonstrated by a defendant and deny a motion to designate out of time." *Id.*

Here, the action was filed on December 22, 1992. Pursuant to § 13–21–111.5, C.R.S., REFCO was required to either designate nonparties or move for an enlargement of time by March 22, 1993. This deadline was not met. Indeed, giving every benefit to REFCO, if the designation period is viewed as commencing on July 1, 1994, the date the stay was lifted, REFCO's designation was due no later than October 1, 1994. REFCO did not file its designation until December 22, 1994. This filing was late by more than three months.

REFCO made no reasonable effort to comply with the statutory limitation period. Moreover, in light of the scope of this litigation and the plethora of related suits filed in various jurisdictions in the United States, I find that untimely designation would impose a significant burden on the efficient progress of this litigation and outweigh the need for designation by REFCO. Consequently, I will grant the motion to strike REFCO's designation of non-parties.

Accordingly, it is ORDERED that:

1. REFCO's motion to dismiss is DENIED;

2. FDIC's motion to strike REFCO's designation of non-parties is GRANTED.