## ENCORE PRODUCTIONS, INC., Plaintiff,

v.

## PROMISE KEEPERS, Michael Whalen d/b/a Whalen & Associates, Inc., Defendants.

### No. Civ.A. 99–B–14.

United States District Court,
D. Colorado.

June 30, 1999.

**1106**

Dennis W. Brown, Ellen Rubright Ivy, Baldwin & Brown, P.C., Denver, CO, Howard M. Wood, III, Phelon, FitzGerald & Wood, P.C., Manchester, CT, for plaintiff.

Brent E. Rychener, Ashley W. Jordaan, Holme Roberts & Owen, LLP, Colorado Springs, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Asserting application of an arbitration clause, Defendant, Promise Keepers ("PK"), moves to dismiss this action pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction, or, in the alternative, to stay it pending arbitration. Defendant, Michael Whalen, moves to dismiss this action pursuant to Rule 12(b)(2) for lack of personal jurisdiction. The motions are fully briefed and heard. For the reasons set forth below, I grant PK's motion to dismiss pursuant to Rule 12(b)(1), and I grant Mr. Whalen's motion to dismiss pursuant to Rule 12(b)(2).

### I.

The following alleged facts are taken from the Plaintiff's Complaint, unless oth-erwise noted. Plaintiff, Encore Productions, Inc. ("Encore"), is an Indiana corporation with its principal place of business in Indiana. PK is a non-profit Colorado corporation with its principal place of business in Denver, Colorado. Mr. Whalen is a resident and domiciliary of Georgia with his principal place of business in Georgia. Diversity jurisdiction is asserted pursuant to 28 U.S.C. § 1332. (Complaint, ¶ 4).

PK is in the business of conducting Christian meetings and conferences for men in stadiums and arenas throughout the United States. On April 18, 1997, PK and Encore entered into a contract designated Encore! Productions, Inc. Service Contract for Promise Keepers Men's Conferences 1997 ("Service Contract") in which Encore would provide production and consulting services in connection with the meetings and conferences conducted by PK.

Paragraph 18 of the Service Contract contains the following mediation/arbitration provision:

Any claim or dispute arising from or related to this Agreement shall be settled by mediation and, if necessary, legally binding arbitration, in accordance with the *Rules of Procedure for Christian Conciliation* of the Institute for Christian Conciliation. Such arbitration shall be held in Colorado unless otherwise agreed by both parties. Judgment upon an arbitration award may be entered in any court otherwise having jurisdiction.

(Service Contract, ¶ 18). The Service Contract also contains the following choice of law provision:

This Agreement shall be governed, construed, and interpreted under the laws of the State of Colorado. Venue on any dispute arising from this Agreement shall be at Arapahoe County, Colorado, unless otherwise agreed by both parties.

(Service Contract, ¶ 22).

After entering into the Service Contract, Encore subcontracted with Mr. Whalen

d/b/a Whalen Associates, Inc. to provide production and stage management services for certain PK conferences in 1997 (the "Subcontract"). The Subcontract contains both a confidentiality agreement and an agreement by Mr. Whalen not to compete with Encore in soliciting business with PK for two years from the termination of the agreement. The Subcontract also contains a choice of law provision which reads, "[t]his agreement shall be construed pursuant to the laws of the State of Indiana." (Subcontract, ¶ 10).

Encore alleges that, beginning in March 1998, "PK and Whalen conspired to terminate Encore's service contract ... and Whalen began sharing confidential information concerning Encore's policies, procedures, methods and pricing, in violation of [the Subcontract]." (Complaint, ¶ 19).

On July 24, 1998, Encore and PK entered into an agreement (the "Termination Agreement") terminating the Service Contract for mutual financial reasons upon certain conditions, among which were that: PK would not violate the terms of any valid non-compete agreement Mr. Whalen had with Encore; Encore would work for PK through the remaining stadium events; and outstanding financial issues would be finalized for 1997 within sixty days from the Termination Agreement and for 1998 within sixty days following the last stadium event.

Encore alleges that in September of 1998, PK wrongfully terminated the Service Contract in regard to all future events. Encore further alleges that PK wrongfully retained Mr. Whalen to perform services in violation of the Service Contract, Termination Agreement, and Subcontract.

Encore filed suit in this court on January 6, 1999, alleging the following seven claims for relief against the respective Defendants in this action:

(1) Interference with Contracts by Whalen;

(2) Interference with Contracts by PK;

(3) Unfair Misappropriation of Business Value by PK and Whalen;

(4) Unfair Trade Practices by PK and Whalen;

(5) Breach of Covenant of Good Faith and Fair Dealing by PK and Whalen;

(6) Breach of Contract—PK; and

(7) Civil Conspiracy by PK and Whalen.

PK then moved to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction based on the arbitration clause, or, in the alternative, to stay proceedings pending arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3 (the "FAA"). Mr. Whalen moved to dismiss the action against him pursuant to Rule 12(b)(2) for lack of personal jurisdiction.

## II.

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." In response to a Rule 12(b)(1) motion, the district court has wide discretion to consider affidavits, documents, and even hold a limited evidentiary hearing. *See Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995); *Morrison v. Colorado Permanente Medical Group,* P.C., 983 F.Supp. 937, 939 (D.Colo. 1997). Both parties to this Rule 12(b)(1) motion have submitted supporting exhibits, all of which I have considered in my ruling. As courts of limited jurisdiction, federal courts may only adjudicate cases that the Constitution and Congress have granted them authority to hear. *See Todd Holding Co., Inc. v. Super Valu Stores, Inc.,* 744 F.Supp. 1025, 1026 (D.Colo.1990). The burden of establishing subject matter jurisdiction and personal jurisdiction is on the party asserting jurisdiction. *See Basso v. Utah Power and Light Co.,* 495 F.2d 906, 909 (10th Cir.1974); *Behagen v. Amateur Basketball Ass'n,* 744 F.2d 731, 733 (10th Cir.1984), cert. denied, 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171, (1985). When a party moves to dismiss a pleading because the pleading does not establish suffi-

cient grounds for the court's jurisdiction, whether the district court has jurisdiction "must be determined from the allegations of fact in the complaint, without regard to mere conclusionary allegations of jurisdiction." *Groundhog v. Keeler,* 442 F.2d 674, 677 (10th Cir.1971).

### III.

#### A.

Here, Encore has placed in issue the existence of a valid arbitration clause by claiming that the subsequent Termination Agreement superseded the original Service Contract and, therefore, disposed of the arbitration clause. When a dispute concerns whether there is a valid and enforceable arbitration clause in the first instance, there is no presumption of arbitrability on this initial issue. *See Riley Manufacturing Co., Inc. v. Anchor Glass Container Corp.,* 157 F.3d 775, 779 (10th Cir.1998). The court will have jurisdiction to determine initially the existence of a valid arbitration clause unless there is "clear and unmistakable evidence" within the four corners of the agreement that the parties intended to submit to an arbitrator the question of whether an agreement to arbitrate exists. *Id.* at 780.

Although the arbitration clause in this case is written broadly, referencing "any claim or dispute arising from or related to this Agreement," there is nothing in the contract that demonstrates the parties' intent to submit to an arbitrator the threshold question of whether an agreement to arbitrate exists or remained in existence after the later agreement. (Service Contract, ¶ 18). Thus, I must resolve the initial question of arbitrability. *See Riley,* 157 F.3d at 781.

#### B.

Encore argues that the arbitration clause in the Service Contract no longer holds any force or effect in the face of the Termination Agreement, claiming that PK "waived its rights to Christian Conciliation

when it entered the new contract on July 24, 1998." (Encore's Objection to PK's Motion to Dismiss or Stay Proceedings, p. 2). The question then is whether the Termination Agreement supersedes the arbitration provision in the Service Contract, making it ineffective to force arbitration.

The Termination Agreement speaks only to the termination of the arrangement between PK and Encore and the additional conditions submitted by Encore. These conditions, as discussed above, refer to termination, the non-compete agreement with Mr. Whalen, the remaining stadium events that Encore agreed to service, and the finalization of the remaining financial issues. The Termination Agreement does not address any new arbitration clause, nor does it discuss the status of the arbitration clause in the previous Service Contract.

Under the federal common law of arbitrability, an arbitration provision in a contract is held to survive the termination of that contract unless there is clear evidence that the parties intended to override this presumption. *See Nolde Bros., Inc. v. Local No. 358, Bakery and Confectionery Workers Union,* 430 U.S. 243, 255, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977) ("where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication."); *Riley,* 157 F.3d at 781. Even if the Termination Agreement effectively terminated the entire Service Contract, including its arbitration provision, "when a dispute arises under an expired contract that contained a broad arbitration provision, courts must presume that the parties intended to arbitrate their dispute. This is so even if the facts of the dispute occurred after the contract expired." *Riley,* 157 F.3d at 781; *see also Hinson v. Jusco Co.,* 868 F.Supp. 145, 148 (D.S.C. 1994) (the subsequent agreement did not supersede the arbitration clause and the dispute, "whether said to have arisen under the [subsequent agreement], the [original agreement containing the arbitration

clause], or some mixture of the two, is within the scope of the arbitration clause contained in the [original contract]").

 This presumption in favor of continuing arbitrability can be rebutted if the parties express or clearly imply an intent to repudiate arbitrability, or, if the dispute cannot be said to arise under the original contract. *See id.* The Termination Agreement in this case has no express language regarding arbitration and no clear showing of an implied intent to repudiate the arbitration clause in the Service Contract. Although Encore has submitted supplemental documents showing PK's attempt to expressly retain Christian Conciliation in the Termination Agreement, which language was ultimately rejected by Encore, this is not enough for the required showing of a clear intent to repudiate the agreement to arbitrate disputes. Even though the suggested language was removed, the remaining language of the effective Termination Agreement of July 24, 1998, includes no language negating the intent to arbitrate under the original Service Contract. *See, e.g., United Steelworkers of America v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 585, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad.") Furthermore, as discussed below, the claims in this matter arise under or relate to the original Service Contract. Although the Termination Agreement purports to "terminate" the contract between the parties, the Tenth Circuit holds that if a subsequent agreement had intended to extinguish an entire previous agreement, it would be expected to do so explicitly. *Riley,* 157 F.3d at 783.

I conclude that the Termination Agreement did not supersede the arbitration provision in the original Service Contract.

Although Encore has not argued that PK's claims do not relate to the Service Contract, out of an abundance of caution I will address whether Encore's claims are within the scope of the original arbitration provision.

## C.

As noted above, Encore makes a total of seven claims for relief in its Complaint against Defendants Whalen and PK; six of these claims are directed at PK. As to the scope of arbitrability, the question is whether the claims implicating PK "arise under" or "relate to" the Service Contract. *See Riley,* 157 F.3d at 785. The arbitration clause in the Service Contract states that it covers "any claim or dispute arising from or related to this Agreement." (Service Contract, ¶ 18). Webster's dictionary defines "relation" as "a logical connection." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 1916. I will evaluate, therefore, whether the claims brought by Encore against PK are related or logically connected to the original Service Contract.

 Consideration of the scope of the arbitration must be in light of the federal policy surrounding the enforcement of arbitration agreements. Because the Service Contract clearly involves commerce as defined by the FAA, 9 U.S.C. §§ 1–2 (1994), the scope of the Service Contract's arbitration clause is a question of federal law. *See Southland Corp. v. Keating,* 465 U.S. 1, 10–13, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

 A strong federal policy favoring arbitration for dispute resolution exists, and this policy "requires a liberal reading of arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 23 n. 27, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). This means that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *See id.* at 24–25, 103 S.Ct. 927; *Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1514

(10th Cir.1995) ("all doubts are to be resolved in favor of arbitrability") (citations omitted). District courts must defer to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute ... doubts should be resolved in favor of coverage." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

With this policy in mind, I conclude that the claims brought against PK are subject to arbitration and, thus, I grant PK's Motion to Dismiss pursuant to Rule 12(b)(2). I will discuss each claim in turn.

 Encore's first claim for relief against PK is one for interference with contract. (Complaint, ¶¶ 32–36). Encore alleges that PK knew of Encore's contract with Mr. Whalen and intentionally induced him to terminate its contract with Encore. Arguably, this claim is not implicated within the four corners of the original Service Contract. The original Service Contract does not specifically address Mr. Whalen or his services. However, as conceded in its Complaint, Encore subcontracted with Mr. Whalen "in fulfilling part of the terms of its service contract with PK." (Complaint, ¶ 17); (Service Contract, ¶ 3, contemplating sub-contracts). Thus, by Encore's own admission, Mr. Whalen's services "relate to" the original Service Contract between Encore and PK. In addition, the Termination Agreement specifically addresses PK's express agreement not to interfere with Mr. Whalen's non-competition agreement. The Termination Agreement references the Service Contract, and its terms necessarily "relate to" the Service Contract. Even assuming ambiguity regarding whether the Interference with Contract claim is within the scope of the arbitration clause, federal policy construes all ambiguities in favor of arbitration. *See Moses H. Cone*, 460 U.S. at 24–25, 103 S.Ct. 927; *Coors Brewing Co.*, 51 F.3d at 1514. Finally, the fact that this claim, as well as other of Encore's

claims, is framed as a tort claim does not prohibit arbitration under the agreement. *See Pierson v. Dean, Witter, Reynolds, Inc.*, 742 F.2d 334, 338 (7th Cir.1984) (tort claims such as "fraud under a contract, breach of fiduciary duty, negligence, and gross negligence are not immune from arbitration under a broadly-worded valid arbitration clause.").

 Encore's second claim against PK is for unfair misappropriation of business value by PK. (Complaint, ¶¶ 37–40). Here, Encore alleges that PK and Mr. Whalen wrongfully capitalized on Encore's experience and expenditure of labor and money in coordinating past PK conferences. This claim relates directly to the Service Contract between PK and Encore because the contract contemplates and outlines the work to be performed by Encore for PK's conferences, exactly the information that PK is alleged to have misappropriated. (Service Contract, ¶ 2, concerning "Scope of Work").

 Encore's third claim for relief against PK is for unfair trade practices. (Complaint, ¶¶ 41–44). In this claim, Encore alleges that PK engaged in a pattern of deceptive practices, including passing off their goods and services as those of Encore. Encore concedes that these alleged actions took place "both prior to the termination agreement and after." (Complaint, ¶ 43). Because the Service Contract involves Encore's goods and services (Service Contract, ¶ 2), and because some of the alleged events took place during the time that the Service Contract was in effect, this claim also "relates to" the Service Contract.

 Encore's fourth and fifth claims for relief against PK are, respectively, for breach of the covenant of good faith and fair dealing and for breach of contract. (Complaint, ¶¶ 45–53). In these claims, Encore alleges that PK willfully and maliciously breached the contract and its corresponding duty of good faith and fair dealing by not honoring its agreement to

pay Encore for the services it provided in a timely manner. Because these claims are based directly on the Service Contract and allegedly involve a breach of the termination provisions in this contract (Service Contract, ¶ 13), their arbitrability is beyond dispute.

 Encore's final claim against PK is for civil conspiracy. (Complaint, ¶¶ 54–58). Encore alleges that PK conspired with Mr. Whalen to terminate the Service Contract so that PK could then retain Mr. Whalen's services. Again, this claim directly concerns the Service Contract and its termination, and "relates to" the Service Contract.

Accordingly, I conclude that Encore's six claims for relief against PK are subject to arbitration and, consequently, I dismiss the claims against PK pursuant to Rule 12(b)(1) for lack of jurisdiction. "Under Colorado law, a valid and unwaived arbitration clause deprives the court of subject matter jurisdiction until the dispute has been submitted to arbitration." *Lee v. Grandcor Medical Systems, Inc.*, 702 F.Supp. 252, 253 (D.Colo.1988); *see also Lorenz v. CSX Transportation, Inc.*, 980 F.2d 263 (4th Cir.1992) (dismissing action on Rule 12(b)(1) motion because of a valid arbitration clause); *Morrison*, 983 F.Supp. at 944 (same).

**D.**

In contesting PK's Motion, Encore presents various arguments centered upon employment of Christian Conciliation as the means of arbitration. I address these arguments in turn.

*i.*

 Encore first argues that this case should not be dismissed because the choice of law provision in the Service Contract conflicts with the governing authority under the Rules of Christian Conciliation. Encore notes that the Service Contract contains a choice of law provision which states that Colorado law will govern its interpretation. (Service Contract, ¶ 22).

Yet, the Rules of Procedure for Christian Conciliation dictate that, "the Holy Scriptures (the Bible) shall be the supreme authority governing every aspect of the conciliation process." (Rules of Procedure for Christian Conciliation, ¶ 4).

For purposes of analysis here, my review of the Rules for Christian Conciliation lead me to conclude that they are not impermissibly inconsistent with the application of Colorado law. Rule 42 of Christian Conciliation states that, "should these Rules vary from state or federal arbitration statutes, these Rules shall control *except where the state or federal rules specifically indicate that they may not be superseded.*" (emphasis added). The choice of law provision will require that the parties look to Colorado law to see whether it supersedes a rule. Rule 40 of the Christian Conciliation Rules states that arbitrators must grant relief that is "within the scope of the agreement of the parties." Because the Service Contract contains a Colorado choice of law provision, the arbitrator must fashion a result that is consistent with Colorado law.

Most importantly, however, Encore's argument regarding the possibility of an unenforceable arbitration award by Christian Conciliation is premature. Encore entered into an agreement to arbitrate, knowing that Christian Conciliation would be employed under the agreement. Courts hold that, generally, disputes should be submitted to arbitration in accordance with parties' contract, and that consideration of what may later happen at the arbitration is premature. *See Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 540, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (claim was "premature" because it had not yet been "established what law the arbitrators will apply to petitioner's claims or that petitioner will receive diminished protection as a result," and because the courts have the limited power to review an award for illegal results); *Ohio Reinsurance Corp. v. British National Insurance Co.*, 587 F.Supp. 710, 712 (S.D.N.Y.1984).

Encore must abide by its agreement in the first instance.

### ii.

Encore also argues that I should not enforce Christian Conciliation because theological conclusions made in the Conciliation may not be reviewed by the courts.

▉ District courts have the power to enforce secular contract rights, despite the fact that one of the contracting parties may base their rights on religious affiliations. *See Elmora Hebrew Center, Inc. v. Fishman*, 125 N.J. 404, 593 A.2d 725, 729 (1991). The arbitration agreement sought to be enforced in this case is a secular contract right.

▉ A court can, and should, apply neutral principles of law to determine disputed questions that do not implicate religious doctrine. *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). "Neutral principles" are secular legal rules whose application to religious parties or disputes do not entail theological or religious evaluations. *See id.* I recognize that I must diligently avoid impermissible First Amendment entanglement. However, by employing neutral principles, courts can review decisions of religious bodies within permissible constitutional boundaries. *See id.* Thus, if cause is later shown to review the Christian Conciliation's arbitration results, a court can do so within the limitations governing review of any arbitration award. This is especially true in this case where the claims do not involve religious determinations or doctrines.

▉ Encore initially agreed to submit its claims to Christian Conciliation in signing the Service Contract. Encore is bound by its contract. Civil courts have only "marginal review" power over the decisions of arbitral bodies, secular and religious. *See Presbyterian Church in United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 447, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). For example, inquiry into a reli-

gious determination may implicate fraud and collusion. These grounds parallel the limited basis on which courts will review the results of conventional arbitrations. *See Serbian Eastern Orthodox Diocese for United States of America and Canada v. Milivojevich*, 426 U.S. 696, 713, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (not allowing court review of "arbitrariness" of a religious tribunal's decision). Consequently, although Christian Conciliation may be characterized as a religious tribunal, any award in arbitration is subject to limited review.

### iii.

▉ Finally, Encore argues that compelling Christian Conciliation will violate their agents' and employees' rights to the free exercise of their religion under the First Amendment. Encore argues that, as a corporation, it cannot validly consent to participate in proceedings of a religious nature and thereby bind its agents and employees to participate in these proceedings without their individual consent.

Encore is incorrect in its assessment of the law. Ordinary contract principles determine who is bound by written arbitration provisions. *See Fisser v. International Bank*, 282 F.2d 231 (2d Cir.1960). Encore and PK executed the Service Contract which contains an enforceable arbitration provision. The arbitration process between these corporations contemplates participation by their principals. By executing the Service Contract on behalf of Encore, Encore's principals consented to participate in an arbitration governed by the Rules of Christian Conciliation.

Furthermore, although Encore is correct that courts cannot employ "religious organizations as an arm of the civil judiciary to perform the function of interpreting and applying state standards," here the parties themselves agreed and consented to arbitration before Christian Conciliation. (Encore's Objection to PK's Motion to Dismiss or Stay Proceedings, p. 7). Al-

though it may not be proper for a district court to refer civil issues to a religious tribunal in the first instance, if the parties agree to do so, it is proper for a district court to enforce their contract. Therefore, Encore is now precluded from challenging the enforcement of this valid agreement. *See Elmora Hebrew Center*, 593 A.2d at 731.

Encore voluntarily signed a contract containing a written arbitration agreement that clearly and expressly disclosed that arbitration would be submitted to Christian Conciliation. This manifests intent to be bound by Christian Conciliation's decree and a knowing and voluntary waiver of their rights to pursue litigation in a secular district court. *See id.* And, significantly, in a letter written to counsel for PK on September 10, 1998, well after the date of the Termination agreement, counsel for Encore stated that Encore was "willing to discuss initiating Christian Conciliation *as mandated under the contract.*" (Exhibit 2 to PK's Reply to Encore's Response, emphasis added).

Impermissible First Amendment entanglement is speculative at this juncture. Indeed, refusal to enforce the parties' arbitration agreement could itself arguably constitute an impermissible entanglement. PK could claim impedance of the practice of religion or creation of an unjust bias against religion, thereby depriving PK of its free exercise rights. *See, e.g., Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (plurality opinion) ("If the purpose or effect of a law is to impede the observance of one or all religions ..., that law is constitutionally invalid even though the burden may be characterized as being only indirect."). Because Encore's First Amendment argument is premature prior to arbitration, I conclude that Encore is bound by its contract.

### E.

The final issue regarding the arbitration clause concerns Mr. Whalen's participation in the arbitration.

PK is correct that, "Encore's contractual obligation to arbitrate does not depend on Whalen's participation." (PK's Reply to Encore's Response, p. 10). Parties who have not executed an arbitration agreement cannot be compelled to arbitrate. *See United Steelworkers*, 363 U.S. at 582, 80 S.Ct. 1347. Moreover, a plaintiff cannot avoid arbitration merely by claiming that one or more of its claims for relief is against a defendant who is not a signatory to the agreement. *See Hilti, Inc. v. Oldach*, 392 F.2d 368, 369 n. 2 (1st Cir. 1968) (arbitration should not be foreclosed simply by adding persons to a civil action who are not parties to the arbitration agreement because such an inclusion would thwart the federal policy in favor of arbitration); *Steinberg & Lyman v. Takacs*, 774 F.Supp. 885, 888 (S.D.N.Y.1991) ("while [plaintiff] asserts that notions of judicial economy favor having this Court try the entire action at one time, rather than sending only two of the defendants to arbitration, such an argument does not withstand the mandate of the [FAA].").

Because Mr. Whalen is not a party to the Service Contract, he is not subject to its arbitration clause. Encore must proceed against Mr. Whalen in a secular court. Federal law requires piecemeal resolution of cases when necessary to give effect to an arbitration agreement. *See Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) ("[T]he Arbitration Act requires district courts to compel arbitration ... even when the result would be the possibly inefficient maintenance of separate proceedings in different forums."); *Moses H. Cone*, 460 U.S. at 20, 103 S.Ct. 927.

### IV.

Mr. Whalen, a resident of Georgia, states that he does not have sufficient contacts with Colorado to support personal jurisdiction and, therefore, moves pursuant to Rule 12(b)(2) to dismiss for lack of personal jurisdiction and to stay discovery.

When a district court rules on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court may review affidavits or other written materials in support of the parties' respective positions. Accordingly, both parties have submitted supporting documentation which I have reviewed in resolving this motion.

 Plaintiff bears the burden of establishing personal jurisdiction over the defendant. *See Far West Capital, Inc. v. Towne,* 46 F.3d 1071, 1075 (10th Cir.1995). When the issue is raised before trial and decided on the basis of affidavits and other written materials, plaintiff need only make a *prima facie* showing. *See id.* The burden on the plaintiff is light. *See Wenz v. Memery Crystal,* 55 F.3d 1503, 1505 (10th Cir.1995). If the parties present conflicting affidavits, I must resolve all disputed facts and draw all reasonable inferences in the plaintiff's favor. *See Behagen v. Amateur Basketball Ass'n of U.S.A.,* 744 F.2d 731, 733 (10th Cir.1984), *cert. denied,* 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985). However, "only the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true." *See Wenz,* 55 F.3d at 1505 (10th Cir.1995).

Jurisdiction over a non-resident defendant in a federal lawsuit based on diversity of citizenship is determined by the law of the forum state—in this case, Colorado. *See Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.,* 17 F.3d 1302, 1305 (10th Cir.1994). Thus, personal jurisdiction over Mr. Whalen arises, if at all, under Colorado's long arm statute, C.R.S. §§ 13–1–124 and 125.

Colorado's long arm statute provides two grounds for the exercise of personal jurisdiction: the commission of a tortious act in Colorado; or the transaction of business in Colorado. C.R.S. § 13–1–124(1)(a) and (b).

**A.**

The first ground for the exercise of personal jurisdiction under Colorado's long arm statute involves the commission of a tortious act in Colorado.

 The tort provision of Colorado's long arm statute states that, by the commission of a tortious act within Colorado, a person submits to the jurisdiction of Colorado courts concerning any cause of action arising from that act. C.R.S. § 13–1–124(1)(b). Addressing the tort provision, the Colorado Supreme Court has held that "[i]n order to satisfy the statutory standard for assertion of long arm jurisdiction ... it is not necessary that both the tortious conduct constituting the cause and the injury constituting the effect take place in Colorado." *See Classic Auto Sales, Inc. v. Schocket,* 832 P.2d 233, 235 (Colo.1992). Instead, Colorado courts have held that the statute may be satisfied when (1) tortious conduct occurs in Colorado, or (2) when tortious conduct initiated in another state causes injury in Colorado. *See id.* at 235–36; *Wenz,* 55 F.3d at 1507. Despite Colorado's broad interpretation of this provision, my review of Encore's allegations, as supported by affidavits, leads me to conclude that Encore has failed to allege or establish a prima facie showing under either.

*i.*

 First, in support of Encore's claim that Mr. Whalen's tortious acts occurred in Colorado, it summarily states, "in June 1998, Mr. Whalen **came to Colorado** to meet with Promise Keepers to discuss Encore's contract." (Encore's Response to Whalen's Motion to Dismiss, p. 4, emphasis in original). The sole support for this statement is an equally conclusory statement in the affidavit of Daniel Caster which states, "[i]n June of 1998, Promise Keepers flew Whalen to Denver, Colorado for meetings with Promise Keepers personnel concerning Encore's contract, Encore's subcontractor and Promise Keepers event covered by Encore's contract with Promise Keepers." (Caster Affidavit, ¶ 4).

Encore bears the burden of establishing that the court has personal jurisdiction over Mr. Whalen. *See Behagen,* 744 F.2d at 733. Because Mr. Whalen's motion to dismiss for lack of personal jurisdiction is submitted on the basis of affidavits and other documents prior to trial, Encore is only required to make a prima facie showing to avoid dismissal. *See F.D.I.C. v. Oaklawn Apartments,* 959 F.2d 170, 174 (10th Cir.1992). In order to put the contested facts in issue, however, affidavits submitted in support of or in opposition to the motion to dismiss for lack of jurisdiction must comply with the requirements of Rule 56(e). *See Oaklawn,* 959 F.2d at 175 n. 6. Therefore, such affidavits must contain "personal knowledge, admissible facts, and affirmative showing of competency." *See id.*

As Mr. Whalen argues in his Objection to the Consideration of Castor's Affidavit, the affidavit "does not affirmatively show it is based upon his own personal knowledge or that he is competent to testify as to the matters therein." (Whalen's Objection, p. 2). I agree that Mr. Castor does not state that he has personal knowledge of Mr. Whalen's trip to Colorado. Nor does he state that he was present at the meeting or had any other way to gain knowledge regarding the meeting. Thus, I find that the affidavit in support of Mr. Whalen's commission of a tort in the state of Colorado does not comply with the requirements under Rule 56(e). There is no showing of personal knowledge or competency. "[O]nly the well pled facts of plaintiff's complaint, as distinguished from mere conclusory allegations, must be accepted as true." *See Wenz,* 55 F.3d 1503.

At the June 18, 1999 hearing on these matters, Encore raised, for the first time, its contention that if the Caster Affidavit was insufficient under Rule 56(e), Encore should be allowed additional discovery under Rule 56(f). The proper procedure under Rule 56(f) is for the non-moving party to file an affidavit before the hearing, "explaining the need for additional discovery."

*See Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 832 (10th Cir. 1986). "Where a party opposing summary judgment and seeking a continuance pending completion of discovery fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in granting summary judgment if it is otherwise appropriate." *Id.* at 832–833.

However, even assuming arguendo that the Caster Affidavit does not suffer from Rule 56(e) deficiencies, the allegations in his affidavit are too conclusory to establish that a tort occurred in Colorado. Because this is the only allegation of a tortious act committed in Colorado, I decline to find personal jurisdiction on this basis.

*ii.*

██ Second, Encore has also failed to demonstrate that any tortious conduct initiated by Mr. Whalen in another state caused injury in Colorado sufficient to invoke long arm jurisdiction under C.R.S. 13–1–124(1)(b).

In interpreting what type of injury is sufficient, the Colorado Supreme Court has stated that "the injury itself must have occurred in Colorado." *McAvoy v. District Court,* 757 P.2d 633, 635 (Colo.1988); *see also Wenz,* 55 F.3d at 1508. The injury in Colorado "must be direct, not consequential and remote." *Wenz,* 55 F.3d at 1508. Only torts which "proximately" result in injury in Colorado constitute a tortious act within the meaning of Colorado's long arm statute. *See Texair Flyers, Inc. v. District Court,* 180 Colo. 432, 506 P.2d 367, 370 (1973).

Encore has failed to allege with any particularity that any injury occurred in Colorado. This is not surprising because Encore is an Indiana corporation with its principal place of business in Indiana. Encore is the only party allegedly harmed in this action and, therefore, any injury that it may have suffered was presumably felt in Indiana. Therefore, I also decline to

exercise personal jurisdiction on this ground.

### B.

The second ground for establishing personal jurisdiction under Colorado's long arm statute is the transaction of business in Colorado. C.R.S. § 13–1–124(1)(a). Transaction of business in a forum state may result in personal jurisdiction under two separate analyses—specific personal jurisdiction and general personal jurisdiction. *See F.D.I.C. v. First Interstate Bank of Denver,* 937 F.Supp. 1461, 1468 (D.Colo. 1996).

■ General jurisdiction may be found when the defendant's contacts with the forum state are so continuous and systematic that the state may exercise personal jurisdiction even when the claims are unrelated to the defendant's contacts with the forum state. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). General personal jurisdiction is premised on a defendant's conduct in connection with the forum state such that he should "reasonably anticipate being haled into court there." *See First Interstate Bank,* 937 F.Supp. at 1468. There must be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state. Contacts between the defendant and the forum state cannot be "random," "fortuitous," or "attenuated." *Id.*

■ On the other hand, specific personal jurisdiction may arise if a defendant has purposefully directed his activities toward the forum state, and if the lawsuit is based upon injuries that arise out of or relate to the defendant's contact with the state. Colorado has adopted a three-prong test for specific personal jurisdiction: (1) the defendant must purposefully avail himself of the privilege of acting in Colorado or of causing important consequences in the state; (2) the cause of action must arise in the forum state from

the consequences of defendant's activities; and (3) the activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *See id.*

■ Due process principles require a defendant to have sufficient minimum contacts with the forum state so that the maintenance of the suit will not offend traditional notions of fair play and substantial justice. *See id.*

■ The evidence supporting Mr. Whalen's contacts with Colorado for the purpose of general jurisdiction is slim. The record shows that Mr. Whalen maintains no offices or employees in Colorado, owns no property in Colorado, maintains no telephone listing in Colorado, and does no advertising in Colorado. Mr. Whalen's contacts with Colorado consist of a handful of phone calls and letters and one alleged visit. This is not the continuous and systematic activity necessary to justify a finding of general jurisdiction. *See Helicopteros Nacionales,* 466 U.S. at 416, 104 S.Ct. 1868 (contacts with Texas not continuous and systematic even though defendant sent its CEO to Houston to negotiate contract with consortium; accepted checks drawn by its consortium on a Texas bank; purchased helicopters, equipment and training services from a Texas manufacturer; and sent personnel to manufacturer's facilities for training).

In determining whether I may exercise specific personal jurisdiction over Mr. Whalen regarding his alleged business transactions in Colorado, I analyze his conduct in light of *First Interstate Bank's* three part test for the minimum contacts sufficient for the exercise of specific jurisdiction. *See First Interstate Bank,* 937 F.Supp. at 1468. Even though the Caster Affidavit is subject to competency defects, I will reference it in this analysis.

### i.

■ The first step in my minimum contact analysis requires me to determine whether the evidence that the plaintiff

presents demonstrates that the defendant purposely availed himself of the privilege of conducting business in Colorado. Purposeful availment requires actions by the defendant which "create a 'substantial connection' with the forum State." *See Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Keeping in mind that, "if the parties present conflicting affidavits, all factual disputes are to be resolved in the plaintiff's favor," and the burden on the plaintiff of proving personal jurisdiction, I make the following findings. *Dart International, Inc. v. Interactive Target Systems, Inc.,* 877 F.Supp. 541, 543 (D.Colo.1995).

Encore alleges that Mr. Whalen appeared at numerous PK events and was introduced as an "official representative of PK." (Caster Affidavit in support of Plaintiff's Response to Mr. Whalen's Motion to Dismiss, ¶ 7). Encore also alleges and provides supporting documentation that Mr. Whalen negotiated subcontracts for PK. (Caster Affidavit, ¶ 8). Furthermore, the Subcontract entered into between Encore and Mr. Whalen is clear in stating that Mr. Whalen will perform the activities described in the contract "in connection with any and all Promise Keeper events held from the 21st day of April, 1997 to the 31st day of October, 1997." (Subcontract, ¶ 1).

Encore alleges that Mr. Whalen was employed as a representative of PK and he negotiated contracts for PK, a Colorado corporation. Ergo, Encore concludes that Mr. Whalen has minimum contacts with Colorado. However, an employee's contacts with a forum state are not judged according to their employer's activities in that state. *See Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Instead, each defendant's contacts with the forum state must be assessed individually. *See id.*

The Subcontract between Encore and Mr. Whalen contemplates business with PK, a Colorado corporation. However, based on the pleadings and supporting documentation, there is no evidence that any of the conferences in which Mr. Whalen participated took place in Colorado. Instead it appears that conferences took place in numerous other locales including Omaha, Nebraska, Grand Rapids, Michigan, and Columbia, South Carolina. (Caster Affidavit, ¶ 7). Although the Subcontract contemplated business activities involving a Colorado based corporation, there is no showing Mr. Whalen transacted business in Colorado.

Merely because "a forum-state resident is a party to the contract and it may be foreseeable that his rights in the forum state will be affected is not a sufficient basis for personal jurisdiction." *Ruggieri v. General Well Service, Inc.,* 535 F.Supp. 525, 532 (D.Colo.1982). Hence, the argument against personal jurisdiction carries more weight when the only basis for personal jurisdiction rests on the mere fact that another party to the contract is a resident of the forum state.

I cannot conclude Mr. Whalen had the minimum contacts with Colorado sufficient for the exercise of personal jurisdiction. There is no evidence that Mr. Whalen made any deliberate efforts, either direct or indirect, to serve the Colorado market. *Dart International,* 877 F.Supp. at 545. As I have stated before,

> the relationship between [the Plaintiff] and [the Defendant], if any, is indirect and derives solely through contacts between third parties in Colorado and [the Defendant].... I find and conclude that [the Defendant's] activities in Colorado are too tenuous to establish that it purposely availed itself of this forum.

*Dart International,* 877 F.Supp. at 545. Likewise, in attempting to establish personal jurisdiction in this case, Encore is pointing to the contacts between Mr. Whalen and PK; these are too tenuous to establish that Mr. Whalen purposefully availed himself of Colorado's forum. The few alleged telephone contacts in the fo-

rum state are not enough to establish the requisite minimum contacts in Colorado. *See Dart International,* 877 F.Supp. at 545. Similarly, the one trip that he allegedly made to Colorado will not suffice. *See Ruggieri,* 535 F.Supp. at 532.

### ii.

■ Even assuming that Encore has shown the requisite minimum contacts under the first prong of the analysis, Encore must still show that Mr. Whalen fulfills the remaining two prongs. The second prong requires proof that the cause of action arises from the consequences of Mr. Whalen's activities in the forum state. Encore alleges that Mr. Whalen traveled to Colorado to discuss Encore's contracts with PK. (Caster Affidavit, ¶ 4). This allegation is in support of claims against Mr. Whalen, including Unfair Misappropriation of Business Value and Unfair Trade Practices. Assuming arguendo competency of the Caster Affidavit, parts of Encore's claims arguably arise out of the allegations of Mr. Whalen's limited forum-related activity.

### iii.

■ In determining whether the third prong of the test is met, I need to decide whether exercise of jurisdiction is so unreasonable as to violate "fair play and substantial justice." In making this determination, I consider: (1) the burden on the defendant; (2) the forum state's interest in resolving the dispute; (3) the plaintiff's interest in receiving convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Asahi,* 480 U.S. at 113, 107 S.Ct. 1026; *OMI Holdings, Inc. v. Royal Insurance Co. of Canada,* 149 F.3d 1086 (10th Cir.1998).

### (a)

■ While not dispositive, the burden on the defendant of litigating the case in a foreign forum is a significant concern in determining the reasonableness of personal jurisdiction. *See World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559. This factor serves to prevent the filing of claims in a distant forum where the burden of appearing is onerous. *See id.; OMI Holdings,* 149 F.3d at 1096.

Mr. Whalen is a resident of Georgia with his primary place of business in Georgia. (Whalen Affidavit, ¶ 2). Mr. Whalen made a contract with an Indiana based corporation, Encore, in connection with a Colorado corporation, PK, with work to be performed across the country. Mr. Whalen asserts that if he is forced to defend this action in Colorado, he will suffer severe financial loss, extreme hardship, and inconvenience. (Whalen Affidavit, ¶ 16). The analysis of this factor weighs in favor of Mr. Whalen.

### (b)

The second factor in the reasonableness inquiry examines the forum state's interest in the action. States have a protectable interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors. *See OMI Holdings,* 149 F.3d at 1096. "Although less compelling, a state may also have an interest in adjudicating a dispute between two non-residents where the defendant's conduct affects forum residents." *Id.*

This factor also weighs in favor of Mr. Whalen. Neither Encore nor Mr. Whalen are Colorado residents. Because PK has been dismissed from this case, there is no longer a Colorado party involved. Neither party conducts business in Colorado, is licensed to do business in Colorado, or employs Colorado citizens. The Subcontract was neither drafted nor negotiated in Colorado. Indeed, the Subcontract contains a choice of law provision specifying the application of Indiana law. Encore does not claim that Mr. Whalen committed a tortious act against or breached a contract with a Colorado resident.

**(c)**

The third step in my reasonableness inquiry is whether the plaintiff may receive convenient and effective relief in another forum. "This factor may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit." *OMI Holdings*, 149 F.3d at 1097.

These dangers are not present here. This factor also weighs in favor of Mr. Whalen. The Subcontract states that Indiana law will govern its interpretation. (Subcontract, ¶ 10). Encore is an Indiana corporation with its principal place of business in Indiana. Mr. Whalen is a resident of Georgia. Encore can receive convenient relief in a forum other than Colorado.

**(d)**

The fourth factor in my inquiry is whether Colorado is the most efficient place to litigate the dispute. The key factors in this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation. *See OMI Holdings*, 149 F.3d at 1097.

At this early stage in the litigation, the parties have not yet identified witnesses to the dispute. Encore claims that part of the wrong underlying the dispute may have occurred in Colorado when Mr. Whalen allegedly flew to Colorado to have illegal discussions with PK. (Caster Affidavit, ¶ 4). Again, Indiana law will govern the interpretation of the Subcontract. Jurisdiction in Colorado is not necessary to prevent piecemeal litigation of this lawsuit. Because I dismissed this action against PK, Encore must now pursue a separate action against Mr. Whalen who signed no agreement to arbitrate. Piecemeal litigation results in any event.

**(e)**

Finally, I consider the interest of the several states in advancing fundamental social policies. The analysis of this factor "focuses on whether the exercise of personal jurisdiction by [the forum state] affects the substantive social policy interests of other states." *OMI Holdings*, 149 F.3d at 1097. Both Indiana and Georgia may have more social policy interests in hearing this matter than does Colorado. Indiana is the forum where Encore resides and Indiana is the law that will govern interpretation of the contract at issue. Georgia is the residence of Mr. Whalen.

**C.**

Examining the above factors, I conclude that subjecting Mr. Whalen to personal jurisdiction in this forum, based on either his alleged tortious conduct or his business transactions, would be unreasonable and inconsistent with notions of "fairplay and substantial justice."

Our personal jurisdiction analysis requires that we draw a line in the sand. At some point, the facts supporting jurisdiction in a given forum are so lacking that the notions of fundamental fairness inherent in the Due Process Clause preclude a district court from exercising jurisdiction over a Defendant.

*OMI Holdings*, 149 F.3d at 1098.

Accordingly, I ORDER that:

(1) Defendant PK's motion to stay proceedings pending arbitration is DENIED;

(2) Defendant PK's motion to dismiss pursuant to 12(b)(1) is GRANTED;

(3) Defendant Whalen's motion to dismiss pursuant to 12(b)(2) is GRANTED;

(4) Defendant Whalen's motion to stay discovery is DENIED as moot; and

(5) Defendants are awarded their costs.