115 F.Supp.2d 1231 (2000)
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Marlwood Commercial Inc., Omega Group Holdings Ltd., Pine Street Investment Ltd., Pinford Portfolio Inc., Helendale Trading Corp., and Telos Finance Ltd., Plaintiffs,
v.
Viktor KOZENY, Landlocked Shipping Company, Peak House Corporation, and Turnstar Limited, Defendants.
No. CIV. A. 00-B-383.
United States District Court, D. Colorado.
June 23, 2000.
*1232 *1233 Frederick J. Baumann, Alan Wendell Anderson, Thomas John Dougherty, II, Rothgerber, Johnson & Lyons, LLP, Denver, CO, Stephen P. Younger, John Andrew Stephenson, Rebecca L. Noonan, Joshua Eli Burstein, Patterson, Belknap, Webb & Tyler, New York, NY, for National Union Fire Ins. Co, of Pittsburgh, PA, Marlwood Commercial, Inc.
Frederick J. Baumann, Alan Wendell Anderson, Thomas John Dougherty, II, Rothgerber, Johnson & Lyons, LLP, Denver, CO, Stephen P. Younger, John Andrew Stephenson, Rebecca L. Noonan, Patterson, Belknap, Webb & Tyler, New York, NY, Matthew N. Kaplan, Daniel J. Kramer, Schulte, Roth & Zabel, L.L.P., New York, NY, for Omega Group Holdings Ltd., Pine Street Investment Ltd., Pinford Portfolio Inc., Helendale Trading Corp. Telos Finance Ltd.
James E. Nesland, Paul Howard Schwartz, Cooley Godward LLP, Denver, CO, for Viktor Kozeny.
Paul R. Franke, III, Bradley J. Haight, Hall & Evans, Denver, CO, for Landlocked Shipping Co., Peak House Corp., Turnstar Ltd.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
BABCOCK, Chief Judge.
Plaintiffs National Union Fire Insurance Company of Pittsburgh, Pa., Marlwood Commercial Inc. (Marlwood), Omega Group Holdings Ltd., Pine Street Investment Ltd., Pinford Portfolio Inc., Helendale Trading Corp., and Telos Finance Ltd., (collectively, Plaintiffs)assert ten claims against Turnstar based on an extensive pattern of alleged fraudulent conduct and breaches of fiduciary duty, resulting in a loss of more than $140 million. Plaintiffs move for a preliminary injunction and pre-judgment writ of attachment against Defendant Turnstar Limited (Turnstar) to prevent dissipation of Turnstar's assets. In addition, Plaintiffs move to extend the May 16, 2000 temporary restraining order and preliminary injunction issued against Defendants Kozeny, Landlocked Shipping Company, and Peak House Corporation to include four motor vehicles located in Aspen, Colorado. Based on the following findings of fact and conclusions of law, and after consideration of counsels' statements, briefs, and evidence presented at the June 22, 2000 hearing, I grant the motion for preliminary injunction against Turnstar pursuant to the Colorado Organized Crime Control Act, § 18-17-106(6). I grant in part and deny in part the motion to extend the May 16, 2000 temporary restraining order and preliminary injunction

I.

Previous Proceedings
Plaintiffs filed this action on February 18, 2000 and requested an ex parte temporary restraining order (TRO) freezing *1234 property located in Pitkin County, Aspen, Colorado. I entered the TRO on February 18, 2000. Thereafter, Plaintiffs filed another TRO seeking to freeze the personalty located at the Aspen home. At an April 19, 2000 hearing, it was represented that the Aspen personalty was "for the most part" owned by "third parties" not before the Court. (Appendix 13, p. 15) Based on this representation, I denied the TRO as to the personalty. See id. at p. 25.
On May 4, 2000, Plaintiffs filed a: 1) first amended complaint adding Turnstar as a party defendant; and 2) motion for ex parte temporary restraining order directed to Turnstar prohibiting the transfer, sale, removal, or other disposition of personalty located at the Aspen property. On May 16, 2000, I granted the TRO against Turnstar based, in part, on an affidavit of John Christensen, Kozeny's interior decorator, in which Christensen averred that at Kozeny's direction, Christensen purchased millions of dollars in furnishings in Turnstar's name, a large portion of which was shipped to the Aspen property. See Appendices 61, 67.
On June 12, 2000, I issued Findings of Fact, Conclusions of Law and Order granting a preliminary injunction against Defendants Kozeny, Landlocked Shipping Company, and Peak House Corporation. See June 12, 2000 Order. I adopt and incorporate into this Order the findings of fact and conclusions of law contained in the June 12, 2000 Order. I now enter the additional following findings of facts and conclusions of law pertinent to Turnstar.

II.
Plaintiffs bring the following claims in this action:

---------------------------------------------------------------------------------------
Claim No. Plaintiff Defendants Claim
---------------------------------------------------------------------------------------
ONE All ALL COCCA § 18-17-104(1), CRS
---------------------------------------------------------------------------------------
TWO All ALL COCCA § 104(2)
---------------------------------------------------------------------------------------
THREE All KOZENY COCCA § 104(3)
---------------------------------------------------------------------------------------
FOUR All ALL COCCA § 104(4) Conspiracy
---------------------------------------------------------------------------------------
FIVE All LANDLOCKED Aiding and Abetting COCCA § 104(1)(2)(3)
 PEAKHOUSE and (4) violations
 TURNSTAR
---------------------------------------------------------------------------------------
SIX All KOZENY Securities Exchange Act § 10(b) SEC Rule
 10b-5 CONTROL PERSON
---------------------------------------------------------------------------------------
SEVEN All KOZENY Securities Exchange Act § 20(a)
---------------------------------------------------------------------------------------
EIGHT All ALL CIVIL CONSPIRACY
---------------------------------------------------------------------------------------
NINE All KOZENY BREACH OF FIDUCIARY DUTY
---------------------------------------------------------------------------------------
TEN All KOZENY BREACH OF FIDUCIARY DUTYCONFIDENTIAL
 RELATIONSHIP
---------------------------------------------------------------------------------------
ELEVEN All KOZENY TORTIOUS INTERFERENCE WITH
 CONTRACT
---------------------------------------------------------------------------------------
TWELVE All KOZENY FRAUD-FALSE REPRESENTATION
---------------------------------------------------------------------------------------
THIRTEEN All KOZENY FRAUD-NON-DISCLOSURE OR CONCEALMENT
---------------------------------------------------------------------------------------
FOURTEEN All LANDLOCKED AIDING AND ABETTING FRAUD
 PEAKHOUSE
 TURNSTAR
---------------------------------------------------------------------------------------
FIFTEEN All LANDLOCKED FRAUDULENT TRANSFER
 PEAKHOUSE
 TURNSTAR
---------------------------------------------------------------------------------------
SIXTEEN All KOZENY NEGLIGENT MISREPRESENTATION
 CAUSING FINANCIAL LOSS IN A BUSINESS
 TRANSACTION
---------------------------------------------------------------------------------------

*1235
---------------------------------------------------------------------------------------
SEVENTEEN All KOZENY INDUCEMENT OF A BREACH OF FIDUCIARY
 DUTY [MINARET AND/OR
 OILY ROCK]
---------------------------------------------------------------------------------------
EIGHTEEN All LANDLOCKED AIDING AND ABETTING A BREACH OF
 PEAKHOUSE FIDUCIARY [OWED BY MINARET
 TURNSTAR AND/OR OILY ROCK]
---------------------------------------------------------------------------------------
NINETEEN All ALL UNJUST ENRICHMENT
---------------------------------------------------------------------------------------
TWENTY All ALL CONSTRUCTIVE TRUST
---------------------------------------------------------------------------------------
TWENTY-ONE All KOZENY ACCOUNTING
---------------------------------------------------------------------------------------

III.

Turnstar Limited

A. Jurisdiction
As an initial matter, Turnstar contends that this Court may not exercise personal jurisdiction over it. I disagree.
"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." Kuenzle v. HTM Sport-Und Freizeitgerate AG, 102 F.3d 453, 455 (10th Cir.1996) quoting Far West Capital, Inc. v. Towne, 46 F.3d 1071, 1074 (10th Cir.1995). By enacting its long-arm statute, § 13-1-124, C.R.S., "the Colorado legislature intended to extend the jurisdiction of [its] courts to the fullest extent permitted by the due process clause of the United States Constitution." Le Manufacture Francaise Des Pneumatiques Michelin v. District Court, 620 P.2d 1040 (Colo.1980). See also Waterval v. District Court, 620 P.2d 5 (Colo.). Because Colorado case law extends its jurisdiction to the limits of the federal constitution, "[my] only concern is whether ... maintenance of the suit ... would ... offend the due process clause of the Fourteenth Amendment." Kuenzle, 102 F.3d at 455 (Wyoming long-arm statute) quoting Shanks v. Westland Equip. & Parts. Co., 668 F.2d 1165, 1167 (10th Cir.1982).
Personal jurisdiction is proper under the Fourteenth Amendment if a nonresident defendant has "certain minimum contacts with [the forum] such that maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The minimum contacts standard may be satisfied in either of two ways. Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1532 (10th Cir.1996). First, a court may exercise specific jurisdiction if a "defendant has `purposely directed' his activities at residents of the forum ... and the litigation results from alleged injuries that `arise out of or relate to those activities.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Also, a defendant's "activities within the jurisdiction must render it foreseeable that the party should reasonably anticipate being haled into the forum court." In re Application to Enforce v. Knowles, 87 F.3d 413, 417 (10th Cir.1996) citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559 (1980). Second, a court may exercise general jurisdiction where the defendant's contacts with the forum state, while not rising to the level of traditional notions of presence in the forum state, are "continuous and systematic." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).
Whether a nonresident has the requisite minimum contacts to establish personal jurisdiction either through the exercise of specific or general jurisdiction *1236 must be evaluated on the facts of each case. Shanks v. Westland Equip. & Parts Co., 668 F.2d 1165, 1167 (10th Cir.1982). "The plaintiffs bear the burden of establishing personal jurisdiction over the defendant[s]." Behagen v. Amateur Basketball Ass'n of U.S.A., 744 F.2d 731, 733 (10th Cir.1984), cert. denied, 471 U.S. 1010, 105 S.Ct. 1879, 85 L.Ed.2d 171 (1985). When the issue of jurisdiction is raised before trial and decided on the basis of affidavits and other written materials, a plaintiff need only make a prima facie showing. Id. In this context, the burden is "light" and all disputed facts and reasonable inferences must be drawn in plaintiff's favor. Encore Prods, Inc. v. Promise Keepers, 53 F.Supp.2d 1101, 1114 (D.Colo. 1999). Personal jurisdiction is a prerequisite to granting injunctive relief. See Citizens Concerned for Separation of Church and State v. City and County of Denver, 628 F.2d 1289, 1299 (10th Cir.1980).

1. Tortious Acts
Jurisdiction over Turnstar may be exercised in Colorado if: 1) tortious conduct occurs in Colorado; or 2) tortious conduct initiated in another state causes injury in Colorado. See Encore Prods., Inc., 53 F.Supp.2d at 1114. Colorado courts liberally construe this provision of the long-arm statute. In re People in Interest of D.R.B., 30 Colo.App. 603, 498 P.2d 1166, 1167 (1972).
Substantial undisputed evidence shows that Turnstar was a shell corporation under Kozeny's control. Proceeds of the alleged Azeri fraud scheme, described at length in the June 12, 2000 Order, were diverted to Turnstar's accounts and then used to purchase furnishings delivered to Peak House. See June 12, 2000 Order, Findings of Fact pp. 1221-1222, 1228; 1225. As I discussed in the June 12, 2000 Order, in December 1997, Kozeny hosted a party at Peak House for wealthy potential investors. Id. at p. 9. After the party, Kozeny met with various investors and offered them the opportunity to invest in the Azeri scheme. See id. Many of the follow-up meetings occurred at the Aspen home. Id. The Aspen home's lavish furnishings were an essential and integral part of Kozeny's method to recruit investors in the Azeri fraud by impressing them with his material wealth. See June 12, 2000 Order, pp. 1216, 1223-1224, 1228.
Based on this evidence, it is likely that Plaintiffs will demonstrate that Turnstar was used by Kozeny to aid and abet the Azeri fraud. The commission of fraud provides a basis for personal jurisdiction in Colorado. Ruggieri v. General Well Serv. Inc., 535 F.Supp. 525, 536 (D.Colo.1982).

2. Transaction of Business in Colorado
This Court may also properly exercise specific jurisdiction over Turnstar because Turnstar transacted business within Colorado. Specific jurisdiction "may arise if a defendant has purposefully directed his activities toward the forum state, and if the lawsuit is based upon injuries that arise out of or relate to the defendant's contact with the State." Encore Prods., Inc., 53 F.Supp.2d at 1116.
Over the course of approximately two and a half years, Turnstar, at Kozeny's direction, purchased millions of dollars of personal property and arranged for its delivery to Colorado. See Appendix 67, ¶ 4. Turnstar's assertion that its "only contact with Colorado is its ownership of personalty located in the state," Response Brief, p. 5, ignores the evidence that Turnstar acquired this personal property, purchased specifically for use in Colorado, with diverted funds. See Appendix 81, pp. 20-24; Appendix 67. Furthermore, the personal property that Turnstar owns is located in Colorado and forms the basis for the cause of action against Turnstar in Colorado. It is also significant that Turnstar had substantial and repeated contact with Colorado in its oversight and direction of the acquisition, delivery, and *1237 installation of the personal property at the Aspen home. See Appendix 67.
Under these circumstances, Turnstar's activities directed to Colorado render it foreseeable that Turnstar should have reasonably anticipated being haled into a Colorado court. See World-Wide Volkswagen, 444 U.S. at 297, 100 S.Ct. 559; Knowles, 87 F.3d at 417. Moreover, maintenance of this suit in Colorado does not offend "traditional notions of fair play and substantial justice." See International Shoe, 326 U.S. at 316, 66 S.Ct. 154.

3. Conspiracy Jurisdiction
In the alternative, this Court may exercise jurisdiction over Turnstar based on conspiracy jurisdiction. Where, as here, Plaintiffs plead with particularity a conspiracy and overt acts taken in furtherance of the conspiracy, a co-conspirator's contacts with the forum may be attributed to other conspirators for jurisdictional purposes. See Pace v. D & D Fuller CATV Construction, Inc., 748 P.2d 1314 (Colo. App.1987) (jurisdiction over non-resident defendant based, in part, on conspiracy allegations). See also Purple Onion Foods, Inc. v. Blue Moose of Boulder, Inc., 45 F Supp.2d 1255, 1258 (D.N.M.1999); Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1031 (D.C.Cir. 1997).
I have found that it is likely that a conspiracy under COCCA existed among Defendants Kozeny, Landlocked Shipping, and Peak House Corp. June 12, 2000 Order, pp. 29-35. Based on the allegations in the first amended complaint, which I accept as true, there is significant evidence that Turnstar was a key player in the same conspiracy. See First Amended Complaint, ¶¶ 102-107; 112-14; 120-25. Thus, this Court has conspiracy jurisdiction over Turnstar.

4. Quasi-in-rem Jurisdiction
In Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Supreme Court indicated in dicta that "a State in which property is located should have jurisdiction to attach that property, by use of proper procedures, as security for a judgment being sought in a forum where litigation can be maintained consistently with International Shoe." Id. at 210, 97 S.Ct. 2569. Other courts have adopted this reasoning. For example, in Barclays Bank. S.A. v. Tsakos, 543 A.2d 802 (D.C.Ct.App.1988), Barclays sought attachment of an apartment in Washington, D.C. pending resolution of court proceedings in France and Switzerland over a defaulted $1.4 million loan. Relying on the "security exception," described in Shaffer, the appellate court held that the trial court could exercise quasi-in-rem jurisdiction over the defendants even though personal jurisdiction was unavailable. See also Carolina Power & Light Company v. Uranex, 451 F.Supp. 1044, 1048 (N.D.Cal.1977)("where the facts show that the presence of defendant's property within the state is not merely fortuitous, and that the attaching jurisdiction is not an inconvenient arena for defendant to litigate the limited issues arising from the attachment, assumption of limited jurisdiction to issue the attachment pending litigation in another forum would be constitutionally permissible."); Cameco Indus., Inc. v. Mayatrac, S.A., 789 F.Supp. 200 (D.Md.1992) (quasi-in-rem jurisdiction asserted over bank account in forum state pending resolution of suits in other jurisdictions); Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd., 62 N.Y.2d 65, 476 N.Y.S.2d 64, 464 N.E.2d 432 (1984)(quasi-in-rem jurisdiction over out-of-state defendants whose sole contact with New York was maintenance of New York bank account that was used to perpetrate fraudulent transactions). I am persuaded by the reasoning of these cases and, thus, will apply their holdings in this case.
Plaintiffs allege and there is ample, undisputed evidence that under the direction of Kozeny, the personalty located in Peak *1238 House in Aspen, Colorado was purchased and shipped to Colorado to conceal a portion of the proceeds of the Azeri fraud. See First Amended Complaint, ¶¶ 100-07. In addition, there is serious concern about the dissipation of Turnstar's assets, particularly in light of efforts to sell the Aspen home, including the personalty. Under these circumstances, I conclude that this Court may exercise quasi-in-rem jurisdiction over Turnstar and the Aspen personalty under the security exception of described in Shaffer. See also Banco Ambrosiano, 62 N.Y.2d 65, 476 N.Y.S.2d 64, 464 N.E.2d 432.

B. FINDINGS OF FACT

1. Turnstar
Turnstar is a foreign corporation organized under the laws of the Bahamas with its principal place of business in Nassau, Bahamas. Turnstar, which is not authorized to do business in Colorado, is the title holder to millions of dollars of personalty located at Peak House in Aspen, Colorado. Appendices 61, 67, 81. Kozeny is the beneficial owner of Peak House. See June 12, 2000 Order, pp. 26-26, 35. Turnstar is also the holder of the deed to a home located at E.P. Taylor Drive in Lyford Cay, Bahamas. Appendix 61. See also Appendix 9, ¶ 35; Appendix 48.

2. Ownership of Turnstar
Plaintiffs present the following undisputed evidence concerning Turnstar:
a. Kozeny's personal assistant, Dorothy McNamara, was an officer and director of Turnstar (Appendix 47);
b. Peter Graham, Kozeny's Bahamian lawyer, was also an officer of Turnstar and signed papers in connection with the acquisition of Kozeny's E.P. Taylor Drive residence (Appendix 48). Mr. Graham's son, a real estate broker, handled this sale ( Appendix 65);
c. Turnstar shares the same telephone numbers and mailing address as another of Kozeny's companies, Harvard Capital Management (Worldwide) Ltd. (Harvard Capital) (Appendix 63);
d. Kozeny's interior designer, John Christensen, states that he purchased millions of dollars in Aspen personalty under the name of Turnstar to protect the confidentiality of Kozeny. (Appendix 67, ¶¶ 4-5);
e. Turnstar is the record owner of the E.P. Taylor Drive residence in the Bahamas (Appendix 48);
f. Kozeny made millions of dollars of improvements to the E.P. Taylor Drive residence, including construction of an $8 million swimming pool (Apps. 64; 46, Farrington Aff. ¶¶ 3, 5-6); and
g. Kozeny sent and received mail from the E.P. Taylor Drive residence (Appendix 70).
In opposition, Turnstar presents an affidavit of its President, Robert Lotmore, who states that Turnstar is owned by Corinth Trust whose trustee is a Liechtenstein trust. The affidavit, does not, however, mention Kozeny or his relationship, if any, to Turnstar. In addition, Turnstar submits a declaration by Defendant Kozeny in which he states that "I do not have any interest, beneficial or otherwise, in Turnstar." Kozeny Declaration, ¶ 3. Kozeny's declaration does not address the acquisition of the Aspen personalty or his contacts with John Christensen.
In balancing all of the evidence concerning Turnstar, I find that Plaintiffs have presented sufficient evidence to supports the inference that Kozeny is the beneficial owner of Turnstar.

3. Turnstar's Connection to Plaintiffs' Azeri Investment Funds
The record reflects over U.S. $9.7 million in wire transfers of Plaintiffs' investment funds from Minaret's Swiss bank accounts to companies that were working on or connected to the Aspen property. These transfers include $790,000 transferred to Turnstar on April 28, 1998. This *1239 transfer was labeled with the names of both Turnstar and Kozeny's mother. Next to this entry were the initials "VK." Appendix 28. Based on the record, it is a reasonable inference that the initials "VK" stand for Viktor Kozeny. See id.

C. Conclusions of Law
Plaintiffs assert COCCA claims against Turnstar and equitable claims including aiding and abetting fraud, fraudulent transfer, aiding and abetting breach of fiduciary duty, unjust enrichment, and constructive trust. First Amended Complaint ¶¶ 108-31; 137-43; 164-68; 204-14; 229-40. Plaintiffs seek a preliminary injunction on five separate theories: 1) COCCA § 18-17-106(6); 2) federal equity power under Fed.R.Civ.P. 65; 3) Colo.R.Civ.P. 102(c) incorporated by Fed.R.Civ.P. 64); 4) principles of comity; and 5) Colorado's fraudulent conveyance statute, C.R.S. §§ 38-8-108(1)(b)-(c).

1. COCCA Injunctive Relief
Pursuant to § 18-17-106(1) and (6), injunctive relief is available for violations of COCCA § 18-17-104 to prevent threatened loss or damage to the Plaintiffs:
(6) Any aggrieved person may institute a proceeding under subsection (1) of this section. In such proceeding, relief shall be granted in conformity with the principles that govern that granting of injunctive relief from threatened loss or damage in other civil cases; except that no showing of special or irreparable damage to the person shall have to be made. Upon the execution of proper bond against damages for an injunction improvidently granted and a showing of immediate danger of significant loss or damage, a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits
§ 18-17-106(6).
In shaping injunctive relief which freezes assets for the purpose of securing satisfaction of any judgment ultimately obtained, pursuant to Fed.R.Civ.P. 64, I look exclusively to state law. Fed. R.Civ.P. 64; see also FDIC v. Antonio, 843 F.2d 1311, 1315 (10th Cir.1988). Pursuant to Colorado law, I consider six factors in determining Plaintiffs' entitlement to a preliminary injunction:
(1) a reasonable probability of success on the merits; (2) a danger of real, immediate, and irreparable injury which may be prevented by injunctive relief; (modified by § 18-17-106(6)); (3) that there is no plain, speedy, and adequate remedy at law; (4) that the granting of a preliminary injunction will not disserve the public interest; (5) that the balance of equities favors the injunction; (6) that the injunction will preserve the status quo pending a trial on the merits.
Colo.R.Civ.P. 65; Kourlis v. District Court, El Paso County, 930 P.2d 1329, 1335 (Colo.1997) citing Rathke v. MacFarlane, 648 P.2d 648, 653-54 (Colo.1982).

2. Likelihood of Success on the Merits of Plaintiffs' Claims

a. COCCA Claims One, Two, Four, and Five
The Colorado Organized Crime Control Act ("COCCA") forbids:
1. any person who knowingly has received proceeds derived, directly or indirectly, from a pattern of racketeering activity or through the collection of an unlawful debt to use or invest, whether directly or indirectly, any part of such proceeds or the proceeds derived from the investment or use thereof in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise. § 18-17-104(1)(a);
2. any person, through a pattern of racketeering activity or through the collection of unlawful debt, to knowingly acquire or maintain, directly or indirectly, any interest in or control of any *1240 enterprise or real property. § 18-17-104(2); and
. . . . .
4. any person to conspire or endeavor to violate any of the provisions of subsection (1), (2), or (3) of [C.R.S. § 18-17-104]. § 18-17-104(4)
Section 18-17-104(1), (2), and(4), C.R.S.
Under COCCA, a "person" is defined as "any individual or entity holding or capable of holding a legal or beneficial interest in property." Based on the undisputed evidence submitted in this case, I conclude that Defendant Turnstar is a "person" within the meaning of § 18-17-104 and as defined in § 18-17-103(4).
A "pattern of racketeering activity" is defined as "engaging in a least two acts of racketeering activity which are related to the conduct of the enterprise...." COCCA, § 18-17-103(3). As pertinent in this case, "racketeering activity" means "to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit," any conduct defined as "racketeering activity" under § 18-17-103 and (5)(a) and 18 §§ U.S.C. § 1961, 1341, 1343, and 1956. See § 18-17-103(5)(a) and (b).
Based on the evidence outlined in the June 12, 2000 Order and above, there is sufficient evidence to show that Kozeny used Turnstar to hide his assets, including monies invested by Plaintiffs in Azeri vouchers and options. Evidence establishes that Kozeny personally instructed Turnstar to use these funds to purchase millions of dollars of personalty for his Aspen home.
Under these circumstances, Plaintiffs have made a substantial showing that Turnstar, individually or through its agents, engaged in racketeering activity by laundering monetary instruments or funds obtained through the Azeri investment scheme by purchasing personalty sent to Aspen, Colorado.
I have determined that Defendants Kozeny, Landlocked, and Peak House Corp. are an "association in fact" comprising an enterprise pursuant to COCCA. See June 12, 2000 Order, p. 1227. The undisputed evidence supports Plaintiffs' assertion that Turnstar is a member of the same enterprise. There is substantial evidence that Turnstar was controlled by Kozeny, received funds from the Azeri investment, and used Azeri investment funds to purchase millions of dollars in personalty now located in Aspen. See Appendix 67. Turnstar was organized in a way that would conceal Kozeny's interest in the Aspen personaltysimilar to the way in which Landlocked was created to hide Kozeny's interest in the Aspen home. Like Defendants Landlocked and Peak House Corp., there is substantial evidence that Turnstar is one of a network of shell companies used and controlled by Kozeny to hide and spend the diverted funds. I conclude that Plaintiffs have made a substantial showing that Turnstar was part of an "association in fact" constituting an "enterprise" within the meaning of § 18-17-104. See June 12, 2000 Order, p. 1228.
Because Turnstar remains as record owner of the Aspen personalty, Plaintiffs are likely to show that Turnstar is part of an ongoing structure. Id. at p. 36. Moreover, because funds transferred by Plaintiffs to Minaret were wired directly to Turnstar and additional funds transferred to Christensen Design were spent on the Aspen personalty, I conclude, preliminarily, that Defendant Turnstar used instrumentalities of interstate commence to perpetrate frauds and launder monetary instruments and funds as forbidden by § 18-17-105(a). See June 12, 2000 Order, pp. 1221, 1229.
Based on the circumstantial evidence outlined above and in the June 12, 2000 Order, I find and conclude that it is likely that Plaintiffs will prove that, during the period September 1997 through at least September 1999:

*1241 1. Turnstar used or invested, directly or indirectly, a portion of the proceeds derived from the pattern of racketeering activity in the acquisition of title to, rights, interests, equity, fixtures, furnishings, personalty or improvements in real property located in Aspen, Colorado, in violation of § 18-17-104(1)(a), C.R.S. See New Crawford Valley, Ltd. v. Benedict, 877 P.2d 1363, 1373 (Colo.App. 1993);
2. Turnstar, through the pattern of racketeering activity described above, knowingly acquired or maintained, directly or indirectly, an interest in the Aspen property located in Colorado, in violation of § 18-17-104(2), C.R.S.;
3. Turnstar, individually and by and through their agents and employees, consciously and knowingly conspired or endeavored to violate the provisions of § 18-17-104(1), (2)(3), and (4) by agreeing, formally or tacitly, or by attempting to participate, directly or indirectly, in the pattern of racketeering activity described herein in violation of § 18-17-104(4), C.R.S. See Salinas v. United States, 522 U.S. 52, 64, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997);
4. As part of this conspiracy, Turnstar, individually and by and through its agents and employees, also committed or agreed to commit two or more predicate acts as defined by § 18-17-103(3) and (5)(a) and as more fully described above, with the knowledge that those acts were part of a pattern of racketeering activity;
5. Defendant Turnstar, individually and by and through its agents and employees, consciously, knowingly and with the intent to promote or facilitate the violation and racketeering activity, aided, abetted, and/or advised Kozeny's violations of the provisions of §§ 18-17-104(1), (2), (3) and (4). See FDIC v. First Interstate Bank of Denver, N.A., 937 F.Supp. 1461, 1470-71 (D.Colo.1996); and
6. Plaintiffs were directly and proximately injured in their business and property by reason of the acts outline in ¶¶ 1-5 suffering losses estimated to exceed $140 million dollars.
Consequently, Plaintiffs have shown that there is a substantial likelihood that they will prevail on the merits of: 1) Claim one for violations of § 18-18-104(1)(a), by Turnstar; 2) Claim two for violations of § 18-18-104(2) by Turnstar; 3) Claim four for violations of § 18-18-104(4) by Turnstar; and 4) Claim five for aiding and abetting Kozeny's violations of § 18-18-104(1), (2), (3) and (4) by Turnstar.

3. Danger of Real, Immediate, and Irreparable injury Preventable by Injunctive Relief
Under COCCA, Plaintiffs need not show irreparable harm to obtain injunctive relief. See § 18-17-106(6).

4. No Plain, Speedy, and Adequate Remedy at Law
The personalty at Peak House is valued at approximately $7 million dollars. Peak House remains on the market. The sale of Peak House may include the personalty. However, significant time may pass before any judgment will be rendered in this case. If a preliminary injunction does not enter, the proceeds from any sale of the personalty, would be beyond the reach of the Court. Thus, any judgment ultimately obtained by Plaintiffs would be of questionable value. Under these circumstances, there is no plain, speedy, and adequate remedy at law available to Plaintiffs.

5. Balance of Equities
If a preliminary injunction issues, Turnstar would suffer no significant adverse consequences. The personalty remains at Peak House. Plaintiffs have posted a $10 million bond in connection with the requested relief. This amount is adequate to protect Defendants from any *1242 injury caused by the injunction. Under these circumstances, in balance, the threatened Injury to Plaintiffs outweighs any damage the proposed injunction may cause Turnstar.

6. Effect of a Preliminary Injunction on the Public Interest; Preservation of the Status Quo
In this case, a preliminary injunction would preserve the status quo. Thus, the public interest would not be adversely affected by such injunctive relief. Rather, because of their lack of assets in the United States, it would be inequitable and against the public interest to allow Turnstar to dissipate its assets in the United States and thereby immunize itself from answering for frauds it is alleged to have committed.
The Colorado Legislature enacted COCCA in order to expand "the sanctions and remedies ... [which] are unnecessarily limited in scope and impact." § 18-17-102. Exercise of the Court's injunctive power is consistent with the expanded remedies provided by COCCA and would further the public interest.
Each of the factors I have considered demonstrate that Plaintiffs are entitled to a preliminary injunction against Turnstar. See Kourlis, 930 P.2d at 1335; Rathke, 648 P.2d at 653-54. Accordingly, I grant Plaintiffs' motion for preliminary injunction pursuant to § 18-17-106(1) and (6) based on violations of COCCA § 18-17-104. Having granted Plaintiffs COCCA injunctive relief, I need not address Plaintiffs' alternative grounds.

IV.

Motion to Extend TRO and Preliminary Injunction to Include Motor Vehicles
Plaintiffs move to extend the May 16, 2000 TRO and preliminary injunction issued against Defendants Kozeny, Landlocked, and Peak House Corp. to include the following vehicles:
1. one GMC Sierra Pickup Truck, black, Colorado license plate number 07261ZG, VIN IGTGK29JXWE506429;
2. one GMC Suburban SLT 2500, black, Colorado license plate number VBS 7860, VIN 3GKGK26JXVG515261;
3. one GMC Suburban SLT 2500, black, Colorado license plate number VBT 3916, VIN 3GKGK26J4WG501034; and
4. one Mercedes S600 four-door sedan, V12, black, no license plate, VIN WDBGA57G5XA421548.
At the June 22, 2000 hearing, I accepted the parties oral stipulation to the extension of the TRO and preliminary injunction to include the two GMC Suburban vehicles and the GMC Sierra pickup truck. The parties also agreed that these three vehicles may be driven during the pendency of this action. However, the three vehicles must remain in the State of Colorado.
Plaintiffs' evidence shows that the Mercedes sedan is titled in the name of O'Gara-Hess & Eisenhardt Company, Inc. (O'Gara-Hess), not a party to this action. Hence, I have no jurisdiction over O'Gara-Hess. Therefore, I deny Plaintiff's motion to extend the TRO and preliminary injunction to include the Mercedes sedan.
Accordingly, IT IS ORDERED that:
1. Plaintiffs' motion for preliminary injunction is GRANTED pursuant to the Colorado Organized Crime Control Act, § 18-17-106(1) and (6) as to Defendant Turnstar Limited;
2. Plaintiffs' motion for extension of temporary restraining order and preliminary injunction is GRANTED as to the following vehicles:
a. one GMC Sierra Pickup Truck, black, Colorado license plate number 07261ZG, VIN IGTGK29JXWE506429;
b. one GMC Suburban SLT 2500, black, Colorado license plate number VBS 7860, VIN 3GKGK26JXVG515261; and

*1243 c. one GMC Suburban SLT 2500, black, Colorado license plate number VBT 3916, VIN 3GKGK26J4WG5010348.
The motion is DENIED as to the Mercedes S600 four-door sedan, V12, black, no license plate, VIN WDBGA57G5XA421548;
3. the GMC Sierra pickup truck and the two GMC Suburban vehicles identified above may be driven during the pendency of this action as long as the three vehicles remain in the State of Colorado at all times; and
4. the $10 million dollar bond currently in place is extended to cover the preliminary injunction against Turnstar Limited.